1
2024 CO 71 Parker Water and Sanitation District, a Colorado special district, Applicant-Appellant: and Meridian Metropolitan District, Arapahoe County Water and Wastewater Authority, East Cherry Creek Valley Water and Sanitation District, Rangeview Metropolitan District, Town of Castle Rock, Cherry Creek Project Water Authority, and South Metro Water Supply Authority, Intervenors-Appellants: v. Kevin G. Rein, in his official capacities as the State Engineer for the State of Colorado and Director of the Colorado Division of Water Resources; Colorado Division of Water Resources; and Corey DeAngelis, in his official capacity as the Division Engineer for Division 1; Appellees: and City of Aurora and City of Greeley, Intervenors-Appellees: No. 23SA141Supreme Court of Colorado, En BancNovember 4, 2024

Appeal
from the District Court District Court, Water Division 1,
Case No. 21CW3046 Honorable Todd L. Taylor, Water Judge

Attorneys for Applicant-Appellant: Hoffmann, Parker, Wilson
& Carberry, P.C. Jefferson H. Parker M. Patrick Wilson
Kathryn M. Sellars Daniel P. Harvey Denver, Colorado

Attorneys for Intervenor-Appellant Meridian Metropolitan
District: Carlson, Hammond & Paddock, LLC Mason Hamill
Brown Denver, Colorado

Attorneys for Intervenor-Appellant Rangeview Metropolitan
District: Hayes Poznanovic Korver LLC Eric K. Trout Denver,
Colorado

Attorneys for Intervenors-Appellants Town of Castle Rock and
South Metro Water Supply Authority: Lyons Gaddis, PC Madoline
Wallace-Gross Longmont, Colorado

Attorneys for Appellees: Philip J. Weiser, Attorney General
Christopher R. Stork, Senior Assistant Attorney General
Denver, Colorado

Attorneys for Intervenor-Appellee City of Aurora: Hamre,
Rodriguez, Ostrander & Dingess, P.C. Austin Hamre Teri L.
Petitt Englewood, Colorado

Attorneys for Intervenor-Appellee City of Greeley: Welborn
Sullivan Meck & Tooley, P.C. Carolyn F. Burr James M.
Noble Denver, Colorado

No
appearance on behalf of: Arapahoe County Water and Wastewater
Authority, Cherry Creek Project Water Authority, and East
Cherry Creek Valley Water and Sanitation District.

Justice Berkenkotter delivered the Opinion of the Court, in
which Chief Justice Márquez, Justice Hood, Justice
Gabriel, Justice Hart, and Justice Samour joined. Justice
Boatright dissented.

OPINION

BERKENKOTTER, JUSTICE

¶1
This case concerns the State Engineer's authority to
limit the total volume of nontributary groundwater that may
be withdrawn from the Denver Basin aquifers over the lifetime
of a well permit. Appellant Parker Water and Sanitation
District ("Parker"), a quasi-municipal special
district, applied for six permits to construct wells to
withdraw nontributary groundwater from the aquifers
underlying the land within Parker's boundaries, pursuant
to multiple water decrees stretching back decades. The State
Engineer approved Parker's applications and issued the
permits. All six of the permits included an allowed average
annual withdrawal-i.e., a maximum rate at which Parker is
permitted to withdraw water from the aquifers each year-as
required by Colorado statute. But five of the six permits
also included, for the first time, an explicit condition
limiting the total volume of groundwater Parker could
withdraw from the aquifers over the life of the well permits.

¶2
In response, Parker filed suit in Water Division One, arguing
that the State Engineer lacks the authority to impose a total
volumetric limit on the amount of nontributary groundwater
available for withdrawal pursuant to a Denver Basin well
permit. The State Engineer counterclaimed, asserting that
section 37-90-137, C.R.S. (2024), and the Statewide
Nontributary Ground Water Rules, Div. of Water Res., 2 Colo.
Code Regs. 402-7 (2024) ("the Rules")-the statute
and regulation that

primarily govern the use and allocation of the groundwater at
issue -unambiguously set forth a total volumetric limit on
the amount of nontributary Denver Basin groundwater a
permittee may withdraw. The water court found in favor of the
State Engineer on all issues. This appeal
followed.[1]

¶3
We now conclude that, under the plain language of section
37-90-137 and the Rules, any well permit issued for the
withdrawal of nontributary groundwater from the Denver Basin
aquifers necessarily imposes a total volumetric limit on the
amount of water that may be withdrawn, whether expressly
stated or not, unless an underlying water court decree
determining a right to use that water explicitly provides
otherwise. This total volumetric limit is equal to the
quantity of nontributary groundwater underlying the land
owned by the applicant as determined by the State Engineer at
the time the well permit is issued, absent any statutorily
authorized adjustments. Pumping beyond this limit would allow
a permittee like Parker to take nontributary groundwater that
belongs to other permittees, all of whom also have a vested
right to use the nontributary

groundwater underlying their land in the amounts determined
by the State Engineer at the time their permits were issued.

¶4
Because the relevant statutory provisions and regulations
unambiguously requires such a volumetric limit, the water
court correctly concluded that the State Engineer has the
authority to expressly include that limit in well permits.
Therefore, for the reasons explained below, we reject
Parker's remaining contentions.

I.
Background

¶5
This case requires us to decide whether the State Engineer
has the authority to limit the total amount of nontributary
groundwater a permittee may withdraw from the Denver Basin
aquifers over the lifetime of a well permit. Understanding
the nature of this dispute-and the significance of the rights
at stake-requires a crash course in both hydrogeology and the
evolution of groundwater regulation in the State of Colorado.
We begin with the basics.

A.
Nontributary Denver Basin Groundwater

¶6
Groundwater is water below the surface of the earth that
occupies empty spaces in rocks, soil, and sand. Colo.
Ground Water Comm'n v. N. Kiowa-Bijou Groundwater Mgmt.
Dist., 77 P.3d 62, 69 (Colo. 2003). This water is in
constant, albeit slow, motion: Once water permeates the soil,
gravity and pressure draw it both downward and sideways
through small spaces between rocks and sediment.

Peter E. Barkmann et al., ON-010 Colorado Groundwater
Atlas, Colo. Geological Surv. 02.01-02.02 (2020),
https://coloradogeologicalsurvey.org/water/colorado-groundwater-atlas/
[https://perma.cc/XX9E-FCEP]. A significant portion of
Colorado's groundwater exists in aquifers, underground
layers of saturated rock and sediment through which
groundwater flows. N. Kiowa-Bijou, 77 P.3d at 69.
These aquifers essentially act as reservoirs from which water
may be mined via wells and put to beneficial use. Barkmann,
supra, at 02.01. Put simply, the drilling of a well
creates a hole in the aquifer. Id. at 02.05. Because
water flows from areas of high pressure to low pressure,
water stored in the aquifer-under pressure from the
surrounding rock and sediment-flows toward that empty space,
where it is pulled by gravity into the hole, and pumped to
the surface. Id.

¶7
Given the state's arid climate and population growth, it
would be difficult to overstate the importance of groundwater
to Coloradans today. Id. at 01.01-01.02. According
to the Colorado Geological Survey, there are currently more
than 285,000 groundwater wells throughout the state and
approximately 18% of the state's water needs are
fulfilled by groundwater resources. Id. at 01.01,
01.03. In recognition of the importance of this resource, the
legislature has, over time, created a comprehensive
regulatory scheme for its management.

¶8
All of Colorado's groundwater is classified and regulated
based on its physical location and relationship with surface
waters. Groundwater is tributary

if it is "hydraulically connected to the surface waters
of a stream." N. Kiowa-Bijou, 77 P.3d at 70;
see also § 37-90-103(10.5), C.R.S. (2024).
Because of this connection, withdrawal of tributary
groundwater may have the effect of depleting available
surface water. N. Kiowa-Bijou, 77 P.3d at 71. Thus,
rights to use tributary groundwater, like surface water, are
determined by the state's water courts and administered
by the State Engineer under the constitutional doctrine of
prior appropriation. Id.

¶9
Nontributary groundwater, on the other hand, is "either
not hydrologically connected or is minimally connected to any
surface stream." Water Rts. of Park Cnty.
Sportsmen's Ranch LLP v. Bargas, 986 P.2d 262,
265-66 (Colo. 1999), as modified on denial of
reh'g (Oct. 4, 1999). This water is not subject to
the doctrine of prior appropriation; rather, the General
Assembly exercises plenary authority over nontributary
groundwater and is empowered to administer and allocate the
water as it sees fit. Id. at 266-67.

¶10
This appeal specifically concerns nontributary groundwater
within the Denver Basin, "a large kidney-shaped region
measuring approximately 6,700 square miles in area with
approximate boundaries stretching from Greeley on the north,
Colorado Springs on the south, the front-range hogback on the
west, and Limon on the east." N. Kiowa-Bijou,
77 P.3d at 72. The Denver Basin consists of four bedrock
aquifers: Dawson, Denver, Arapahoe, and Laramie-Fox Hills.
Id.

These aquifers are stacked upon one another and are separated
by impermeable, confining layers. Id. Water
contained in bedrock aquifers, including those that make up
the Denver Basin, "represents] a tremendous volume when
taken in the aggregate." Id. at 69. Estimates
have placed the total volume of recoverable water in the
Denver Basin aquifers as high as 292 million
acre-feet,[2] some 1,200 times the volume of water
contained in Dillon Reservoir. Id. at 72 n.18.

(Image
Omitted)

Figure
1 depicts a cross-section of the formations containing the
Denver Basin aquifers. The Denver Basin cross-sections shown
in this figure, from top to bottom, are the Dawson Formation,
Denver Formation, Arapahoe Formation, Laramie Formation, and
Fox Hills Sandstone. The figure is reproduced from the
Colorado Division of Water Resources and the Colorado
Geological Survey Special Publication 53.

¶11
Like all surface and groundwater in Colorado, "Denver
Basin aquifer water is a public resource," Chatfield
E. Well Co. v. Chatfield E. Prop. Owners Ass'n, 956
P.2d 1260, 1264 (Colo. 1998), and any groundwater right is a
use right, not "an absolute

right to ownership of water underneath [the] land,"
id. at 1268 (citing Bayou Land Co. v.
Talley, 924 P.2d 136, 146-47 (Colo. 1996)). Because of
its unique characteristics and significant economic
importance, however, Denver Basin aquifer water is classified
and managed separately from the rest of the state's
groundwater. Id. at 1270. Owing to the region's
geology, groundwater in the Denver Basin aquifers is only
directly recharged by precipitation where there are
outcroppings along the basin edges. U.S. Geological Surv.,
Groundwater Availability of the Denver Basin Aquifer
System, Colorado viii (Suzanne S. Paschke ed., 2011),
https://pubs.usgs.gov/pp/1770/ [https://perma.cc/2WBP-KCUM].
Thus, while "[t]ributary waters are not subject to
eventual depletion because they are annually
replenished" by precipitation, State v. Sw. Colo.
Water Conservation Dist., 671 P.2d 1294, 1313 (Colo.
1983), the same is not true of Denver Basin aquifer water.
Indeed, well pumping of Denver Basin aquifer water has long
exceeded recharge,[3] resulting in a so-called "mining
condition" that will eventually drain the Basin of
recoverable water. Id.; see also N.
Kiowa-Bijou, 77 P.3d at 72 n.18

(observing that pumping from the Denver Basin aquifers
exceeds recharge in the Basin). Because it is not readily
replenished and is instead subject to depletion over time,
"there is a need to conserve this finite resource to
offset the mining of the aquifers caused by pumping that may
reduce discharge [to surface streams] and deplete water
storage." N. Kiowa-Bijou, 77 P.3d at 80. The
total amount of nontributary groundwater in the Denver Basin
is further limited given the estimate that roughly 50% of the
groundwater in the Basin is not recoverable. M.W. Bittinger,
The Denver Basin: Its Bedrock Aquifers 3 (1978). For
all these reasons, Denver Basin groundwater is recognized by
Colorado law as a nonrenewable, exhaustible resource.
Chatfield, 956 P.2d at 1265.[4]

¶12
The Colorado Groundwater Management Act, sections 37-90-101
to -143, C.R.S. (2024), governs Denver Basin groundwater.
Unlike groundwater in the rest of the state, the Act
categorized Denver Basin aquifer water as either nontributary
or not nontributary.[5] Each category is subject to different
regulations. See

§§ 37-90-103(10.5), (10.7), -137(4). Denver Basin
aquifer water is nontributary if its withdrawal "will
not, within one hundred years of continuous withdrawal,
deplete the flow of a natural stream ... at an annual rate
greater than one-tenth of one percent of the annual rate of
withdrawal." § 37-90-103(10.5). Denver Basin
groundwater is not nontributary[6] if it is hydrologically connected
to a surface stream such that its withdrawal will
"deplete the flow of a natural stream" at a rate
greater than that. § 37-90-103(10.7).

¶13
The General Assembly exercises plenary authority over
nontributary Denver Basin aquifer water and is empowered to
administer and allocate the water

as it sees fit. Bargas, 986 P.2d at 266. The
regulatory scheme imposed by the General Assembly through a
series of enactments over a half-century reflect the General
Assembly's attempt to strike a delicate balance between
"two primary concerns": "diminishment of the
historically available supply of the South Platte River
system through well pumping" and the "'great
economic importance'" of Denver Basin groundwater to
overlying landowners. Chatfield, 956 P.2d at 1270
(quoting § 37-90-103(10.5)). We turn now to discuss that
regulatory scheme.

B.
Administration and Allocation of Nontributary Denver Basin
Groundwater

¶14
As part of its plenary authority over water resources in
Colorado, the General Assembly is entrusted with implementing
laws related to nontributary groundwater. Sw. Colo. Water
Conservation Dist., 671 P.2d at 1307. Colorado law
governing nontributary groundwater "has developed more
slowly than that with respect to tributary water."
Id. at 1311. Prior to 1965, the General Assembly
"acted only sparingly" with regard to groundwater
regulation and made no distinction between tributary and
nontributary groundwater. Id. at 1311-12. Motivated,
however, by the "need to ration use of essentially
non-renewable ground water in the high plains region,"
the legislature enacted the Colorado Ground Water Management
Act in 1965 ("1965 Act"). Upper Black Squirrel
Creek Ground Water Mgmt. Dist. v. Goss, 993 P.2d 1177,
1182 (Colo. 2000).

¶15
The 1965 Act recognized that "[u]nderground water basins
require management that is different from the management of
surface streams and underground waters tributary to such
streams." Fundingsland v. Colo. Ground Water
Comm'n, 468 P.2d 835, 839 (Colo. 1970). This is
because nontributary groundwater "is not subject to the
same ready replenishment enjoyed by surface streams and
tributary ground water" and may be withdrawn at "a
rate in excess of the annual recharge creating what is called
a mining condition." Id. Thus, "[u]nless
the rate of pumping is regulated, mining [of nontributary
groundwater] must ultimately result in lowering the water
balance below a level from which water may be economically
withdrawn." Id.

¶16
The 1965 Act required a party wishing to drill a new well or
expand the production of an existing well to first obtain a
permit from the State Engineer. § 148-18-36(1), C.R.S.
(1963 &1965 Supp.) ("From and after [May 17, 1965],
no new wells shall be constructed outside the boundaries of a
designated ground water basin, nor the supply of water from
existing wells outside the boundaries of a designated ground
water basin increased or extended, unless the user shall make
an application in writing to the state engineer for a
'permit to construct a well ....'"). This new
statutory scheme authorized the State Engineer to issue well
permits for the construction of all wells in the state,
including (though not explicitly) wells to withdraw
nontributary groundwater. Ch. 319, sec. 1,

§ 148-18-37(1), 1965 Colo. Sess. Laws 1246, 1266-67. It
did not consider ownership of the overlying land in
determining the amount of nontributary groundwater a
potential permittee could withdraw. Bayou Land Co.,
924 P.2d at 147.

¶17
In 1973, responding to concerns about the potential depletion
of nontributary groundwater resources throughout the state,
the General Assembly enacted Senate Bill 213. William
Fronczak, Designated Ground Water: Colorado's Unique
Way of Administering Its Underground Resources, 7 U.
Denv. Water L. Rev. 111, 123 (2003). The first legislative
enactment to expressly regulate nontributary groundwater,
Senate Bill 213, amended section 148-18-36 - later
re-codified at section 37-90-137(5) -to limit nontributary
groundwater withdrawals to "only that quantity of water
underlying the land owned by the applicant" and
established a "sip slowly" rationing provision
intended to ensure a "minimum useful life of the aquifer
[of] one hundred years." Ch. 441, sec. 1, §
148-18-36(5), 1973 Colo. Sess. Laws 1520, 1520.[7] Put another way,
through Senate Bill 213, the legislature conditioned the
right to withdraw nontributary groundwater "upon

overlying land ownership . . . with available quantity
determined by a 100 year aquifer life expectancy."
Bargas, 986 P.2d at 266.

¶18
In 1985, the General Assembly statutorily defined
nontributary groundwater for the first time through the
enactment of Senate Bill 5, see Ch. 285, sec. 2,
§ 37-90-103(10.5), 1985 Colo. Sess. Laws 1160, 1161, and
set out a comprehensive regulatory scheme for its allocation
and administration, id. at 1160-69; N.
Kiowa-Bijou, 77 P.3d at 71 n.13. While largely retaining
the language of Senate Bill 213, the legislature also
authorized the State Engineer to promulgate rules and
regulations for the administration of nontributary
groundwater and the standardization of well permitting,
see § 37-90-137(9)(a), and, at the same time,
subjected Denver Basin groundwater to the new water use
system laid out in section 37-90-137(4), Chatfield,
956 P.2d at 1270. Senate Bill 5 amended section 37-90-137(4)
"to define the legal standards for issuing well permits
and decrees for the use of Denver Basin aquifer water"
and established specific criteria for use by the State
Engineer in determining whether to issue a well permit for
the withdrawal of nontributary groundwater.
Chatfield, 956 P.2d at 1269; see also Sw. Colo.
Water Conservation Dist., 671 P.2d at 1314.

¶19
The legislature, recognizing the "unique, finite nature
of nontributary ground water resources," declared that
"such nontributary ground water shall be devoted to
beneficial use in amounts based upon conservation of the
resource and

protection of vested water rights" and that "the
development of nontributary ground water resources consonant
with conservation shall be the policy of this state."
Ch. 285, sec. 1, §37-90-102(2), 1985 Colo. Sess. Laws
1160, 1160-61. Acknowledging that the regulatory framework
enacted through Senate Bill 5 was based upon "the best
available evidence at this time," the General Assembly
further declared that such water "shall be allocated . .
. upon the basis of ownership of the overlying land."
Id. Thus, the "legislature's enactment of
Senate Bill 5 confirmed and clarified the connection between
ownership of land and nontributary ground water rights, which
was first announced in Senate Bill 213." Bayou Land
Co., 924 P.2d at 148. Further, these enactments
"created an inchoate right to control and use a
specified amount of nontributary ground water in owners of
the overlying land." Id. at 149.

¶20
In 1986, pursuant to its newly delegated authority, the State
Engineer promulgated the Statewide Nontributary Ground Water
Rules, a comprehensive set of rules related to the
nontributary groundwater provisions in section 37-90-137.
See Div. of Water Res., 2 Colo. Code Regs. 402-7
(2024). Rule 8(B) provides that "[t]he total amount of
water recoverable from a specific aquifer from a well or
wells shall be determined by multiplying the number of acres
of overlying land . . . by the average number of feet of
saturated aquifer materials in the aquifer underlying those
lands by the average specific yield of

those saturated aquifer materials." Div. of Water Res.,
2 Colo. Code Regs. 402-7:8(B) (2024). This total is then used
to calculate the average annual amount of withdrawal, which
"shall be 1% of the total recoverable water."
Id. Rule 8(A) echoes Rule 8(B) and section
37-90-137(4). It bases the allowed average annual withdrawal
on an aquifer life of one hundred years and states that
"[t]he allowed average annual amount of withdrawal for
all of the wells on the overlying land shall not exceed one
percent of the total amount of water, exclusive of artificial
recharge, recoverable from a specific aquifer beneath the
overlying land." Div. of Water Res., 2 Colo. Code Regs.
402-7:8(A) (2024).

¶21
A landowner's inchoate right to use nontributary Denver
Basin groundwater vests once they construct a well in
accordance with a well permit issued by the State Engineer.
N. Kiowa-Bijou, 77 P.3d at 71. Alternatively, a
landowner can seek a decree from the water court determining
their right to withdraw nontributary Denver Basin
groundwater. Id. Like the State Engineer's
issuance of a well permit, the water court's
determination of a groundwater right is governed by the
statutory scheme allocating groundwater on the basis of land
ownership. Id. Under section 37-92-203(1), C.R.S.
(2024), of the Water Right Determination and Administration
Act of 1969, the water court is authorized to determine the
amount of nontributary Denver Basin groundwater an overlying
landowner is entitled to withdraw. N. Kiowa-Bijou,
77 P.3d at 75. And, like

construction of a permitted well, "[s]uch an
adjudication by the water court creates a vested water use
property right in the overlying landowner." Id.
at 71.

¶22
Whether a use right is established by a well permit or by a
decree of the water court, a landowner must obtain a permit
from the State Engineer before they can construct a well to
withdraw nontributary groundwater. See §
37-90-137(1)(a), (4). And, in any event, withdrawals are
subject to the conditions and standards set forth in section
37-90-137 and the Rules. N. Kiowa-Bijou, 77 P.3d at
72. Taken together, the statutory provisions and the Rules
establish that: (1) withdrawals are based on an expected
aquifer life of one hundred years; (2) the allowed average
amount of withdrawal, exclusive of artificial recharge,
cannot exceed one percent of the total amount of water
recoverable from the portion of the aquifer underlying the
land; (3) the allowed amount of withdrawal under a permit and
decree shall be the same; and (4) a reduction in either
hydrostatic pressure or water level in the aquifer caused by
withdrawals shall not result in a material injury to vested
nontributary groundwater rights. Id.

¶23
It is against this regulatory backdrop that we turn to the
facts and history of this case.

II.
Facts and Procedural History

¶24
Parker is a quasi-municipal Colorado special district that
supplies water to residents and businesses within its
boundaries for domestic and other public and

private purposes.[8] In 2018, the most recent year for which an
estimate is available, Parker supplied water to approximately
53,000 Coloradans. The majority of Parker's annual water
supply is produced by deep wells withdrawing water from the
Denver Basin aquifers. In 2020, Parker's thirty-three
Denver Basin wells produced some 9,500 acre-feet of water -
constituting more than half its total water supply that year.

A.
Parker's Well Permits and Decreed Rights to Nontributary
Groundwater

¶25
Since Parker's inception in 1962, the water court has
issued several decrees vesting Parker's rights to use
nontributary groundwater contained in the Denver Basin
aquifers. Beginning in 1981, pursuant to its decreed rights,
Parker sought and was issued numerous well permits allowing
it to withdraw nontributary

groundwater from the Denver Basin aquifers. Each of these
permits contained an allowed annual average withdrawal-i.e.,
a maximum annual rate at which Parker could withdraw water
from the well. None of its permits explicitly imposed a total
volumetric limit on the amount of groundwater it could
withdraw pursuant to the permit.

¶26
In January 2021, Parker applied for six new well permits
pursuant to section 37-90-137(4) that would allow it to
withdraw nontributary groundwater from the Denver Basin
aquifers in accordance with its decreed groundwater rights.
The State Engineer approved the applications and issued all
six permits. Consistent with its earlier permits, each of
Parker's new permits contained an allowed annual average
withdrawal. But as noted, five of the six permits, unlike
those issued previously, contained an explicit total
volumetric limit on the amount of water available for
withdrawal. It is those total volumetric limits that are the
subject of the case now before us.

B.
Proceedings in the Water Court

¶27
Parker filed a complaint in Water Division One under section
24-4-106, C.R.S. (2024), of the State Administrative
Procedure Act, asserting that the State Engineer lacked the
authority to include a total volumetric limit in a well
permit. In Parker's view, the State Engineer's
inclusion of the limit was arbitrary and capricious, an abuse
of discretion, and contrary to law. Parker asserted in its

amended complaint that the limit violated its statutory and
constitutional rights, as well as its vested groundwater
rights, as established by existing decrees of the water
court. Parker asked the water court to declare the total
volumetric limit unlawful, to enjoin enforcement of the
condition, and to order the State Engineer to reissue the
permits without the total volumetric limit.

¶28
Shortly thereafter, the City of Aurora ("Aurora")
and the City of Greeley ("Greeley") sought leave to
intervene. Aurora argued that a decision favoring Parker
could harm Aurora's vested nontributary and not
nontributary groundwater rights given that its service area
was within a half-mile of Parker's service area. Greeley
emphasized that it disagreed with Parker's position and
asserted that a decision in Parker's favor would impact
other nontributary groundwater decrees and permits in other
regions across Colorado because the statute applies to
nontributary groundwater throughout the state. The court
granted both motions to intervene.

¶29
The State Engineer answered Parker's complaint and
asserted a counterclaim for declaratory relief, arguing that
section 37-90-137(4) and Rule 8(B) describe and provide for a
total cap on the amount of groundwater available for
withdrawal pursuant to a well permit. Thus, the State
Engineer, who administers and allocates nontributary
groundwater throughout the state, sought a declaration

that he acted within his statutory authority in including an
explicit total volumetric limit in Parker's well permits.

¶30
After Parker served written discovery on the State Engineer,
the State Engineer moved to stay discovery, asserting that no
factual discovery was necessary because it intended to seek
only a determination as to whether the plain language of the
statute and Rules sets forth and requires a total volumetric
limit on groundwater withdrawals. The water court granted the
State Engineer's motion and stayed all discovery pending
its ruling on the State Engineer's counterclaim
("2021 Order"). The State Engineer then moved for a
determination of two questions of law pursuant to C.R.C.P.
56(h): (1) whether the plain language of section 37-90-137(4)
provides for a total volumetric limit applicable to well
permits authorizing withdrawal of nontributary and Denver
Basin groundwater and (2) whether the Rules likewise set
forth a total volumetric limit.

¶31
Parker responded with a cross-motion for determination of
three questions of law, contending that (1) section 37-90-137
unambiguously does not provide for, contemplate, or allow a
total volumetric limit to be imposed on groundwater well
permits; (2) the Rules likewise do not provide for,
contemplate, or allow such a limit; and (3) the State
Engineer lacked the authority to impose a total volumetric
limit or to promulgate rules and regulations providing for
such a limit.

¶32
In a June 2022 order ("2022 Order"), the water
court found in favor of the State Engineer on all issues,
first determining that section 37-90-137 unambiguously sets
forth a total volumetric limit on groundwater withdrawals
pursuant to a well permit. The court began its analysis with
section 37-90-137(4)(b)(II)'s provision limiting
withdrawals to "that quantity of water, exclusive of
artificial recharge, underlying the land owned by the
applicant." This statutory language unambiguously refers
to a volumetric limit, the court concluded. "By
definition, a quantity of water is a volumetric
limit," it explained, noting that "[f]or purposes
of water engineering, volume is defined as a
'specific quantity of water generally expressed in terms
of acre-feet.'" (Quoting Leonard Rice &Michael
D. White, Engineering Aspects of Water Law 179
(1991).) Thus, the water court determined that the total
quantity limitation was both expressly stated in the statute
and plainly understood to be the quantity of nontributary
groundwater underlying the land owned by the applicant.

¶33
The water court then rejected Parker's argument that the
statute authorizes only an average annual rate of withdrawal
without a total volumetric limit. That position is illogical,
the court explained, because under section
37-90-137(4)(b)(I), the average annual rate of withdrawal is
limited to a maximum of one one-hundredth-or, said
differently, one percent-of the total amount of water
underlying the applicant's land. "Even if the State
Engineer was authorized to set

only an annual average rate of withdrawal," the court
continued, "the math to determine the total volumetric
limit would be simple: the average annual rate of withdrawal
multiplied by 100 years equals the total amount of
groundwater that can be withdrawn over the life of a well
permit." Thus, the court concluded that the express
volumetric limit represented the total amount of groundwater
underlying the applicant's land and is simply a different
way of mathematically expressing the annualized rate limit of
one percent of that quantity of water multiplied by the
100-year life of the aquifer.

¶34
Having determined that section 37-90-137 unambiguously sets
forth a volumetric limit, the court turned to whether the
State Engineer was authorized to include such a limit in a
well permit. Because the State Engineer is obligated by
statute "to ensure that no more water is withdrawn from
an aquifer than what is physically available under the
applicant's land," the court wrote, it follows that
the State Engineer is empowered "to determine this total
volumetric limit in order to enforce it." Thus, the
court concluded that the State Engineer acted within the
bounds of his statutory authority by including a total
volumetric limit equal to the quantity of nontributary
groundwater the State Engineer determined was physically
available under the applicant's land at the time the
permit was issued.

¶35
The court likewise determined that Rule 8(B), consistent with
section 37-90-137(4), unambiguously provides for a total
volumetric limit. In the

court's view, Rule 8(B)'s provision stating that the
"allowed average annual amount of withdrawal shall be 1%
of the total recoverable water," Div. of Water Res., 2
Colo. Code Regs. 402-7:8(B) (2024), explicitly imposes a
total volumetric limit on nontributary groundwater
withdrawals from Denver Basin aquifers over the lifetime of a
well permit equal to the quantity of nontributary groundwater
the State Engineer determined was physically available under
the applicant's land at the time the permit was issued.

¶36
Following this analysis, the court granted the State
Engineer's motion and denied Parker's cross-motion.

¶37
The State Engineer then sought resolution of the remaining
issues raised by its counterclaim through a second motion for
determination of questions of law. This time, the State
Engineer asked the court to determine whether (1) the State
Engineer has the administrative authority to issue well
permits including a total volumetric limit, even if any
applicable water court decree does not specifically state
that limit; (2) a total volumetric limit must be expressly
stated in a well permit or decree to be enforceable; and (3)
such a limit also applies to well permits and decrees issued
under the prior version of the statute, Senate Bill 213
(effective July 6, 1973), before it was amended by Senate
Bill 5 (effective July 1, 1985), even if those decrees and
well permits do not expressly include a total volumetric
limit.

¶38
On March 2, 2023, the water court again ruled in favor of the
State Engineer on all issues ("2023 Order"). The
water court rejected Parker's contention that it has the
right to withdraw nontributary Denver Basin groundwater at
the stated maximum annual rate of withdrawal indefinitely if
the decree adjudicating its groundwater right did not
explicitly impose a total volumetric limit because
"[t]his contention contradicts long-standing principles
of Colorado water law." In the court's view, the
General Assembly made clear when it enacted Senate Bill 213
in 1973 that "only that quantity of water underlying the
land owned by the applicant . . . is considered to be
unappropriated" (quoting § 37-90-137(4), C.R.S.
(1973)). Thus, the water court concluded that the plain
language of the 1973 statute-under which some of Parker's
water decrees and well permits were issued-unambiguously
provided for a total volumetric limitation on withdrawals of
nontributary groundwater from Denver Basin wells and that the
volumetric limitation is equal to the quantity the State
Engineer determined was physically available under the
applicant's land at the time the permit was issued.

¶39
"Colorado law has recognized for at least the past 50
years that nontributary groundwater is a finite resource that
must be responsibly managed and conserved to prolong its
longevity," the court continued. Thus, it concluded that
Parker's decrees "do not grant them the right to
unlimited pumping of nontributary groundwater." Rather,
the court determined that, consistent with the finite nature

of nontributary groundwater, the decrees both implicitly and
explicitly limit the total amount of water available for
withdrawal to only that water underlying the land identified
in the decree. That total amount available for withdrawal,
the court explained, is the same total the State Engineer
determined in order to calculate the allowed annual average
amount of withdrawal.

¶40
The water court then certified the 2021, 2022, and 2023
Orders as final. This appeal followed.

III.
Analysis

¶41
We begin by laying out our well-established principles of
statutory construction and the standards of review applicable
to this case. We then address each of the issues that Parker
raised.

A.
Principles of Statutory Construction and Applicable Standards
of Review

¶42
This case turns on the meaning of several statutory
provisions and administrative regulations. Statutory
interpretation is a question of law that we review de novo.
Dep't of Nat. Res. v. 5 Star Feedlot, Inc., 2021
CO 27, ¶ 20, 486 P.3d 250, 256. Our goal is to ascertain
the intent of the General Assembly and "adopt the
statutory construction that best effectuates the purposes of
the legislative scheme." Bargas, 986 P.2d at
268 (quoting M.S. v. People in Int. of L.R.S., 812
P.2d 632, 635 (Colo. 1991)). We look to the statutory scheme
as a whole "to give consistent, harmonious, and sensible
effect to all its parts." 5 Star Feedlot, Inc.,
¶ 20, 486 P.3d at 256.

We read words and phrases in context and construe them
according to their plain and ordinary meanings.
Bargas, 986 P.2d at 268. "Words and phrases
that have acquired a technical or particular meaning whether
by legislative definition or otherwise," however,
"shall be construed accordingly." § 2-4-101,
C.R.S. (2024).

¶43
If the language of a statute is unambiguous-i.e., it is not
susceptible to multiple reasonable interpretations-our job is
done, and we need look no further. Bargas, 986 P.2d
at 268. But if the statutory language is ambiguous, we may
consider other tools of statutory construction, including the
consequences of a given construction, the purpose of the
statute, and legislative history. Id. "We
presume throughout that the General Assembly intended a just
and reasonable result and that it favored the public interest
over any private interest." Id. We avoid
statutory constructions that would lead to illogical or
absurd results. 5 Star Feedlot, Inc., ¶ 20, 486
P.3d at 256.

¶44
We apply these same rules of statutory construction to the
interpretation of administrative regulations. Educhildren
LLC v. Cnty. of Douglas Bd. of Equalization, 2023 CO 29,
¶ 28, 531 P.3d 986, 993. "While we may afford
deference to an agency's reasonable interpretation of a
statute that it is charged with administering, we are not
bound by it." Id.

¶45
Lastly, we review a court's order on discovery for abuse
of discretion. In re People in Int. of J. P., 2023
CO 57, ¶ 17, 538 P.3d 337, 343.

B.
Section 37-90-137 Unambiguously Imposes a Total Volumetric
Limit on Nontributary Groundwater Withdrawals Pursuant to a
Well Permit

¶46
The parties in this appeal specifically dispute the meaning
of several provisions of section 37-90-137(4). These
provisions set forth the process for determining the amount
of groundwater underlying an applicant's land and,
accordingly, the average annual allowed withdrawal for a
given well.

¶47
Parker contends that the water court erred in holding that
the plain language of section 37-90-137 allows the State
Engineer to limit the total volume of nontributary
groundwater that may be withdrawn from Denver Basin aquifers
over the lifetime of a well permit. In Parker's view, a
permittee is entitled to withdraw all the tributary
groundwater under its land in perpetuity, subject only to the
annual rate of withdrawal. Thus, if it is still able to pump
water from its wells two hundred years after the issuance of
the well permits, it may lawfully do so, subject only to the
average annual rate of withdrawal limitation. Under
Parker's reading of the pertinent statutes, a landowner
is not required to cease pumping its allowed annual
allocation under a Denver Basin well permit until the supply
of nontributary groundwater in the aquifer beneath its land
is physically exhausted.

¶48
The State Engineer counters that the water court did not err
because the statute unambiguously imposes a total volumetric
limit. In the State Engineer's view, the water court
correctly interpreted section 37-90-137(4)(b) to refer only
to that quantity of water the State Engineer determines is
underlying the land at the time the State Engineer issues the
permit. This interpretation means a permittee withdrawing one
percent of the total quantity of water underlying its land
each year could only do so for one hundred years, at which
point it would have mined the full quantity of water
underlying its land. A permittee could, the State Engineer
asserts, only extend the life of a well permit beyond one
hundred years by withdrawing, on average, less than one
percent of that water annually until they have withdrawn a
total amount of water equal to the well's total
volumetric cap. According to the State Engineer, a permittee
could not, under any circumstances, exceed a well's total
volumetric limit. As a result, once a well's total
volumetric limit is reached, the permittee must stop
operating the well. Pumping beyond the volumetric cap would,
the State Engineer argues, result in the taking of
nontributary groundwater that belongs to other permittees,
all of whom also have a vested right to use the nontributary
groundwater underlying their land in the amounts determined
by the State Engineer at the time their permits were issued.

¶49
To address this disagreement, we look to the plain language
of section 37-90-137(4). It provides that "the amount of
. . . groundwater available for withdrawal shall be that
quantity of water . . . underlying the land owned by
the applicant," § 37-90-137(4)(b)(II) (emphasis
added), and that well permits issued pursuant to the statute
"shall allow withdrawals on the basis of an aquifer life
of one hundred years." § 37-90-137(4)(b)(I). To
settle this dispute, we must discern the plain and ordinary
meaning of the word "quantity." Black's Law
Dictionary defines "quantity" as "[t]he amount
of something measurable; the ascertainable number of
countable things." Quantity, Black's Law
Dictionary (12th ed. 2024). Thus, the common meaning of
"quantity" suggests that "quantity of
water" as used in the statute refers to a measurable
amount of water.

¶50
Recall, however, that groundwater is not static but instead
flows through the aquifer, albeit slowly. Barkmann,
supra, at 02.01. Because groundwater moves, and
because cumulative withdrawals of Denver Basin groundwater
necessarily draw down the overall quantity of water within
the basin's aquifers, the quantity of water directly
underlying any given parcel of land is certain to change over
time. Barkmann, supra, at 02.01. Thus, to issue a
permit, the State Engineer must first determine "the
amount of such groundwater available for withdrawal."
37-90-137(4)(b)(II); see also V Bar Ranch LLC v.
Cotten, 233 P.3d 1200, 1206 (Colo. 2010) (explaining
that the General Assembly "vested the State Engineer

with administrative authority over the distribution of the
surface and groundwaters of the state"). Importantly,
this determination can only be made by calculating the amount
of nontributary groundwater underlying the land at the time
that the permit or decree is issued.

¶51
In our view, these statutory provisions are unambiguous. When
read together with an eye towards an interpretation that
gives "consistent, harmonious, and sensible effect to
all its parts," 5 Star Feedlot, Inc., ¶
20, 486 P.3d at 256, they necessarily impose a total
volumetric limit on withdrawals of nontributary Denver Basin
groundwater over the lifetime of a well permit. Put simply,
the statute provides that a landowner is entitled to that
quantity of nontributary groundwater underlying their land,
as determined by the State Engineer at the time the permit is
issued.

¶52
In order to effectuate the legislature's stated intent to
ensure a useful life of the Denver Basin aquifers of at least
100 years, each permittee is allowed to withdraw their water
at a rate no greater than one percent of their total
allocation. The calculation of that allowed average annual
withdrawal-which must be expressly stated in a well
permit-cannot be accomplished without first determining the
quantity of water underlying the land that is available for
withdrawal by each permittee. And, importantly, the Denver
Basin aquifers cannot be fairly rationed and allocated among
permittees if some are allowed to

exceed their allocation, as determined by the State Engineer,
at the cost of other permittees. This is the argument that
was advanced by intervenors Aurora and Greeley-both of which
also have rights to use nontributary groundwater from the
Denver Basin-before the water court.

¶53
To be sure, Parker is correct that the statute mandates the
inclusion of only an annual amount of withdrawal in well
permits-an amount that is based on the concept of a 100-year
aquifer life and which reflects a withdrawal rate rather than
a total volumetric limit. But we reiterate that the statute
requires the State Engineer to calculate the measurable
quantity of tributary groundwater underlying each
applicant's land at the time the permit is issued.
Without this determination, the State Engineer cannot
determine the annual rate of withdrawal. Put differently, the
State Engineer cannot calculate an annual rate of withdrawal
based on an undefined quantity of water that is certain to
change over time. This calculation also cannot be fairly
understood to include recoverable nontributary groundwater
underlying land not owned by the permittee.

¶54
In this regard, Parker's construction of the statute
ignores the hydrogeology of the groundwater at issue. The
impact of pumping groundwater from an aquifer ripples beyond
the actual water that is withdrawn. Withdrawal of aquifer
water decreases overall water levels throughout the aquifer.
See N. Kiowa-Bijou, 77 P.3d at 80 ("[P]umping
that exceeds recharge will eventually deplete the usable
water

in the Denver Basin aquifers."). Importantly,
withdrawals also result in a drop in hydrostatic pressure in
the area surrounding the well. This creates a cone of
depression and draws water within the well's zone of
influence toward the well. In other words, the act of pumping
can pull groundwater underlying a neighboring permittee's
land toward the well. Absent a total volumetric limit, a
permittee who continues to pump at the maximum permitted rate
for more than 100 years would end up pulling water to its
well that would not otherwise be underlying its land.

¶55
Were we to embrace Parker's interpretation that
permittees are entitled to withdraw at the annual rate in
perpetuity, the result would be a race to the bottom of the
aquifer, with earlier permittees receiving a significant head
start. This result undermines the clear legislative intent to
balance this economically critical resource's beneficial
use with its conservation and the protection of vested
groundwater rights.

¶56
Three provisions of the governing statutory scheme in
particular support our construction that well permits are
subject to total volumetric limits. First, section
37-90-102(2), C.R.S. (2024), mandates that nontributary
groundwater "shall be allocated . . . upon the
basis of ownership of the overlying land." (Emphasis
added.) According to Black's Law Dictionary,
"allocation" means "[t]he amount or share of
something that has been set aside or designated for a
particular

purpose." Allocation, Black's Law
Dictionary (12th ed. 2024). Thus, based on the plain meaning
of the term, nontributary groundwater that is allocated to a
particular well permit based on overlying land ownership is
"set aside" at the time the permit is issued.
Noting again that groundwater is not stationary and that
pumping of groundwater draws water toward the well, a
construction of section 37-90-137(4) that would allow a
permittee to continuously withdraw water beyond the quantity
underlying their land when their permit was issued would
essentially authorize the withdrawal of nontributary
groundwater allocated to other permittees.

¶57
Second, section 37-90-137(9)(a) imbues the State Engineer
with the authority to "adopt rules and regulations to
prescribe reasonable criteria and procedures" regarding
well permits. But it limits the universe of permissible rules
and regulations to those which "allow the withdrawal
pursuant to such permits of the full amount of
groundwater determined under subsection (4)."
Id. (emphasis added). The "full amount of
groundwater determined" by the State Engineer during the
well permitting process is, we reiterate, necessarily a
snapshot of the quantity underlying the land at the time the
determination is made.

¶58
Third, the annual amount of withdrawal stated in a well
permit is subject to "subsequent adjustment . . . to
conform to the actual aquifer characteristics encountered
upon drilling of the well or test holes." §
37-90-137(4)(d). This

provision reflects the legislature's recognition of the
difficulties inherent in determining the quantity of
groundwater underlying an applicant's land. It also
supports our construction of the statute when taken as a
whole.

¶59
And, if upon constructing the well or drilling test holes,
the permittee discovers that the State Engineer's
determination of the quantity of water underlying their land
appears to be inaccurate, under section 37-90-137(4)(d), the
State Engineer may adjust its determination of that quantity,
thereby adjusting the annual amount of withdrawal. Under
Parker's interpretation, this provision would serve
little purpose: A permittee could simply withdraw groundwater
in accordance with the stated allowed average annual amount
of withdrawal rate until the physical supply of groundwater
is exhausted, without the need for such an adjustment to
conform to the actual aquifer characteristics.

¶60
We agree with the State Engineer that a permittee could
extend the life of a well permit beyond one hundred years by
withdrawing less than the one percent maximum rate until they
have reached their total volumetric limit. However, once the
total volumetric limit is reached, the permittee must stop
operating the well because pumping beyond the volumetric cap
would result in the taking of nontributary groundwater that
belongs to other permittees, each of which has their own
vested right to use one percent of the total amount of
nontributary

groundwater underlying their land as determined by the State
Engineer at the time their permits were issued.

¶61
Finally, we note that the existence of a total volumetric
limit has been implicitly recognized by this court in prior
cases. In Bayou Land Co., for example, we explained
that "the legislature has created an inchoate right to
control and use a specified amount of nontributary
ground water in owners of overlying land." 924 P.2d at
149 (emphasis added). We later noted in N.
Kiowa-Bijou that "[a] use right is a specific
entitlement to a quantity of Denver Basin ground
water underneath the applicant's land." 77 P.3d at
66 (emphasis added). Our decision today is consistent with
these earlier pronouncements.

¶62
For all these reasons, we now hold that the plain language of
section 37-90-137(4) unambiguously imposes a total volumetric
limit on the amount of nontributary Denver Basin groundwater
a permittee may withdraw over the lifetime of a well permit.
The total volumetric limit is equal to that quantity of
nontributary groundwater underlying the applicant's land
as determined by the State Engineer. While that quantity is
calculated at the time the permit is issued, it can be
revised upon the presentation of new information to the State
Engineer. We further hold that, even where not expressly
stated, such a total volumetric limit exists by implication
in every well permit issued pursuant to

section 37-90-137(4) and is equal to one hundred times the
maximum annual amount of withdrawal.[9]

C.
Well Permits Issued Under Senate Bill 213 Are Also Subject to
a Total Volumetric Limit

¶63
Parker maintains that, even if the current version of the
statute imposes a total volumetric limit, no such limit
applies to its well permits issued under Senate Bill 213.
According to Parker, the earlier version of the well
permitting statute - enacted through Senate Bill 213 in 1973
and in effect until the passage of

Senate Bill 5 in 1985-unambiguously did not provide for, set
forth, or authorize a total volumetric limit on withdrawals
of nontributary Denver Basin groundwater. We disagree.

¶64
Recall that Senate Bill 213 amended the statute to add a new
subsection, which stated, in relevant part, that:

[I]n considering whether [a well] permit shall be issued,
only that quantity of water underlying the land owned by
the applicant or by the owners of the area, by their
consent, to be served is considered to be unappropriated;
[and] the minimum useful life of the aquifer is one hundred
years, assuming that there is no substantial artificial
recharge within said period ....

§ 37-90-137(4), C.R.S. (1973) (emphasis added).

¶65
Looking again to the plain and ordinary meaning of the
statutory language, we read "that quantity of water
underlying the land owned by the applicant" to have the
same meaning as the substantially similar language in section
37-90-137(4)(b)(II), and we conclude that the phrase
unambiguously refers to a measurable amount of water.
Merriam-Webster defines "appropriate" as "to
take exclusive possession of" or "to set
apart for or assign to a particular purpose or use
Appropriate, Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/appropriate
[https://perma.cc/JS4J-4SF2] (emphasis added). Thus, Senate
Bill 213 clearly provided that "only that quantity of
water" not already exclusively possessed or assigned to
another is available for withdrawal pursuant to a well
permit.

¶66
Moreover, in our view, the General Assembly's instruction
that "only that quantity of water" is
unappropriated and therefore available for withdrawal
evidences a legislative intent to impose a limit on the total
quantity of groundwater a permittee may withdraw. See
Only, Merriam-Webster Dictionary,
https://www.merriam-webster.com/dictionary/only
[https://perma.cc/76T3-3HLB] (defining "only" as
"alone in a class or category" or "solely,
exclusively").

¶67
And, as with the current version of the statute, this court
has implicitly acknowledged the existence of a total
volumetric limit on groundwater withdrawals for permits
issued under Senate Bill 213. In Bargas, for
example, we explained that through Senate Bill 213, "the
General Assembly . . . limited withdrawals of
nontributary ground water to the amount of water
underlying the well owner's land." 986 P.2d at 269
n.16 (emphases added).

¶68
Accordingly, we hold that a total volumetric limit on
withdrawals of nontributary Denver Basin groundwater is
implied in and applies to all well permits issued under
Senate Bill 213, even if such a limit is not explicitly
stated in the permit or decree.

D.
The Statewide Nontributary Ground Water Rules Unambiguously
Impose a Total Volumetric Limit

¶69
This same logic leads us to reject Parker's contention
that a total volumetric limitation is not authorized by the
Statewide Nontributary Ground Water Rules. We agree with the
water court that the unambiguous language of Rule 8 of the

Statewide Nontributary Ground Water Rules imposes a total
volumetric limit on the withdrawals of nontributary
groundwater from Denver Basin wells. The relevant portions of
Rule 8 read as follows:

A. The allowed average annual amount of withdrawal shall be
based on an aquifer life of 100 years in accordance with
Section 37-90-137(4)(b)(I), C.R.S. The allowed average annual
amount of withdrawal for all of the wells on the overlying
land shall not exceed one percent of the total amount of
water, exclusive of artificial recharge, recoverable from a
specific aquifer beneath the overlying land. However, the
allowed annual amount of withdrawal may exceed the allowed
average annual amount of withdrawal as long as the total
volume of water withdrawn from the well or wells does not
exceed the product of the number of years since the . . .
issuance of the well permit . . . times the allowed average
annual amount of withdrawal.

B. The total amount of water recoverable from a specific
aquifer from a well or wells shall be determined by
multiplying the number of acres of overlying land . . . by
the average number of feet of saturated aquifer materials in
the aquifer underlying those lands by the average specific
yield of those saturated aquifer materials. The allowed
average annual amount of withdrawal shall be 1% of the total
recoverable water....

Div. of Water Res., 2 Colo. Code Regs. 402-7:8 (2024).

¶70
By setting forth a formula the State Engineer is to use in
determining a "total amount of water recoverable,"
Rule 8(B) plainly sets forth a total quantity of water that a
permittee is allowed to withdraw under a well permit. The
fact that this quantity is then used to calculate the allowed
average annual amount of withdrawal does not strip it of its
independent significance: Over the lifetime of a well permit,
a permittee may only withdraw "the total amount of water

recoverable," as determined by the State Engineer at the
time the permit is issued. Rule 8(B) explicitly states as
much, explaining that "the allowed average annual amount
of withdrawal shall be 1% of the total recoverable
water." This provision necessarily imposes a total
volumetric limit.

¶71
If a permittee withdraws the maximum allowed average annual
amount of withdrawal each year, then at the end of year 100,
the permittee will have withdrawn 100 percent of the
"total amount of water recoverable." Were we to
adopt Parker's construction-allowing a permittee to
continue withdrawing water in perpetuity so long as the well
is able to draw water-then a permittee would be able to
withdraw more than 100% of the quantity of water the
State Engineer determined to be underlying the land. Such a
result is plainly illogical, as it would allow for the mining
of water beyond the amount underlying the applicant's
land. As we have explained, we must avoid regulatory
interpretations that lead to illogical results.

¶72
Thus, when read as a whole, the Rules unambiguously impose a
total volumetric limit on nontributary groundwater
withdrawals from Denver Basin wells over the lifetime of a
well permit.

E.
The State Engineer Has the Authority to Impose a Total
Volumetric Limit

¶73
Parker next contends that the State Engineer lacks the
authority to impose a total volumetric limit on nontributary
groundwater withdrawals. In Parker's

view, the State Engineer's inclusion of such a limit was
arbitrary and capricious, contrary to law, and constituted an
abuse of discretion. Again, we disagree.

¶74
Through the Colorado Groundwater Management Act, the General
Assembly delegated to the State Engineer the duty and
authority to issue and administer nontributary groundwater
well permits in accordance with the statute. V Bar Ranch
LLC, 233 P.3d at 1206; § 37-90-110(1), C.R.S.
(2024). Given our conclusion that the statute and the Rules
unambiguously limit the total amount of nontributary Denver
Basin groundwater that may be withdrawn over the lifetime of
a well permit, we hold that the State Engineer has the
authority to impose such a limit.

¶75
We reiterate that the State Engineer's inclusion of a
stated total volumetric limit on well permits, while a change
in form, is not a change in substance: All nontributary
Denver Basin well permits, whether they explicitly state a
total limit or not, necessarily include an implicit total
volumetric limit of one hundred times the allowed average
annual amount of withdrawal.

F.
The State Engineer's Inclusion of a Total Volumetric
Limit Does Not Violate or Impair Parker's Decreed
Nontributary Groundwater Rights

¶76
As previously noted, a landowner can perfect their inchoate
right to use nontributary groundwater either by obtaining a
well permit and constructing a well or by applying for and
receiving a water court decree determining their rights

in the groundwater. In this case, most of Parker's well
permits were issued pursuant to water court decrees that
adjudicated the groundwater underlying the land and
established Parker's vested groundwater rights. Parker
contends that because these decrees lacked an explicit total
volumetric limit and many also contained language requiring
the State Engineer to issue permits in accordance with, and
no more burdensome than, the terms of the decree, the State
Engineer's inclusion of the total volumetric limit in its
well permits violated the terms of its existing decrees and,
as a result, impairs its vested groundwater rights. We are
not persuaded.

¶77
Through the Water Right Determination and Administration Act
of 1969 and subsequent amendments, the General Assembly
imbued water courts with exclusive jurisdiction over water
matters, including the authority to adjudicate and determine
nontributary groundwater rights. Sections 37-92-302 to -305,
C.R.S. (2024), lay out the procedure by which a water court
may adjudicate water rights and rights in nontributary
groundwater, but the extent of a right to nontributary
groundwater is nonetheless governed by the same statutory
provisions applicable to well permits for such groundwater.
This is apparent from the plain language of section
37-90-137(6), which provides that "[r]ights to
nontributary groundwater outside of designated groundwater
basins may be determined in accordance with the procedures of
sections 37-92-302 to 37-92-305," but that any
"determination of

the right to such water for existing and future uses . . .
shall be in accordance with subsections (4) and (5)
of this section." (Emphasis added.) Accordingly, any
decree determining rights to nontributary groundwater is
subject to the statutory limitations set forth in section
37-90-137(4), even if the decree is silent as to this
limitation. And, because the plain language of section
37-90-137(4) imposes a total volumetric limit on groundwater
withdrawals pursuant to a well permit, a total volumetric
limit is likewise, by necessity, implied in every water
decree determining a right to use nontributary groundwater.
Like the State Engineer, a water court cannot calculate and
impose an allowed annual amount of withdrawal without
initially quantifying a total volume of water underlying an
applicant's land.

¶78
This construction is also consistent with earlier decisions
of this court that have implicitly recognized such a limit.
In N. Kiowa-Bijou, for example, we explained that a
water court's "[a]djudication of nondesignated
Denver Basin ground water enabled the landowner . . . to
obtain a decree establishing a use right to withdraw water at
a later time for a specific quantity of Denver Basin
ground water underneath her land." 77 P.3d at 75
(emphasis added); see also id. at 66 ("A use
right is a specific entitlement to a quantity of
Denver Basin ground water ...." (emphasis added)).
Before issuing a decree, "the court determines the
amount of

nontributary ground water . . . that the landowner may
withdraw." Id. at 71 (emphasis added).

¶79
We reiterate that a nontributary groundwater right is an
inchoate right in the overlying landowner to use that
groundwater lying beneath the land. Because the
landowner's nontributary groundwater right vests when the
court issues a decree establishing that right, the relevant
quantity of water is that quantity underlying the land when
the decree is issued. In other words, the total amount of
water available for withdrawal is fixed at the time the
decree is entered.

¶80
Thus, for the same reasons that we read section 37-90-137(4)
as setting forth and requiring a total volumetric limit on
the amount of water that may be withdrawn from Denver Basin
aquifers over the lifetime of a well permit, we now hold that
a total volumetric limit is implied in every water court
decree establishing the right to use nontributary Denver
Basin groundwater, unless a decree determining a right to use
that water explicitly provides otherwise.

G.
The Water Court Did Not Abuse Its Discretion in Staying
Discovery

¶81
Finally, we address Parker's contention that the water
court abused its discretion by staying all discovery until it
ruled on the State Engineer's counterclaim. Through its
motion for discovery, Parker sought to introduce evidence as
to the meaning of the applicable statutory provisions and the
Rules.

¶82
When presented with questions of statutory interpretation,
courts must first analyze the plain language of the statute.
Recall that, where the language is ambiguous-i.e.,
susceptible to multiple interpretations-courts may consider
extraneous evidence as to its meaning and apply tools of
statutory construction to determine the legislative intent.
But if the language is unambiguous, courts must enforce the
statute as written and "look no further." Bd.
of Cnty. Comm'rs v. Costilla Cnty. Conservancy
Dist., 88 P.3d 1188, 1193 (Colo. 2004). Here, the water
court found the relevant language unambiguous and resolved
each of the questions of law before it on the plain language.
Because we agree with the water court that the statute and
the Rules are unambiguous, we conclude that the water court
acted within its broad discretion in staying discovery.

IV.
Conclusion

¶83
For the foregoing reasons, we conclude that (1) section
37-90-137 unambiguously sets forth a total volumetric limit
on withdrawals of nontributary Denver Basin groundwater over
the lifetime of a well permit equal to the quantity of water
underlying the landowner's land as determined by the
State Engineer at the time the State Engineer issues a
permit; (2) well permits issued under Senate Bill 213 are
also subject to this total volumetric limit; (3) the
Statewide Nontributary Ground Water Rules likewise
unambiguously impose a total volumetric limit; (4) the State
Engineer has the authority to include this total

volumetric limit on nontributary groundwater well permits;
(5) water court decrees determining use rights for
nontributary Denver Basin groundwater set forth a total
volumetric limit on withdrawals unless an underlying decree
determining a right to use that water explicitly provides
otherwise; and (6) the water court did not abuse its
discretion in staying discovery.

¶84
Accordingly, we affirm the orders of the water court.

JUSTICE BOATRIGHT dissented.

JUSTICE BOATRIGHT, dissenting.

¶85
Today the majority concludes that "the plain language of
section 37-90-137(4)[, C.R.S. (2024),] unambiguously imposes
a total volumetric limit on the amount of nontributary Denver
Basin groundwater a permittee may withdraw over the lifetime
of a well permit." Maj. op. ¶ 62. But for the past
fifty years, landowners outside of designated groundwater
basins have believed their nontributary pumping rights to be
limited only by (1) the annual rate of withdrawal specified
in their well permit or water court decree, and (2) the
physical quantity of recoverable water underlying their land.
By introducing a new limit-a total volumetric cap and
interrelated 100-year permit lifetime, determined by the
State Engineer at the time of permit issuance-the
majority's ruling upends these expectations. Moreover,
the majority's interpretation curtails vested water
rights, not just in the Denver Basin, but statewide. This
construction of the statute requires the conclusion that the
General Assembly abrogated these rights with neither express
language nor any debate in the legislature. The
plain language, lengthy legislative history, and this
ruling's likely consequences lead me to conclude that the
legislature never intended to cap pumping after 100 years.
Instead, I present the following version of events in support
of my conclusion.

¶86
In 1973, the State Engineer's Office ("SEO")
asked the legislature for guidance to support the SEO's
issuance of well permits in the Denver Basin.

Specifically, the SEO sought a statutory determination
regarding how long of an "aquifer life" it should
use as the basis for its engineering determinations. In
essence, the question that the SEO posed to the legislature
was: How long do you want the groundwater in the state's
nontributary aquifers, including the Denver Basin aquifers to
last? The answer: at least 100 years.

¶87
To achieve that goal, the legislature enacted section
37-90-137, balancing its twin aims of economic development
and prudential use of the state's water resources. In so
doing, the legislature decided to allow continued pumping,
but also to regulate annual withdrawal rates such that no
landowner would exhaust their underlying water in less than
100 years. Accordingly, the legislature directed the SEO to
ensure that permittees "sipped slowly" by issuing
permits with pumping rates based on achieving a minimum
aquifer life of 100 years. However, the legislature
understood the uncertainty inherent in estimating, at the
time of permit issuance, both the current and future
quantities of recoverable groundwater underlying an
applicant's land. Because of this uncertainty, the
legislature knew it was possible that significant quantities
of recoverable water might remain underlying permittees'
lands after 100 years of pumping. To account for this
possibility, section 37-90-137 guarantees landowners a
minimum of 100 years of pumping, not a
maximum.

¶88
But now, after fifty years of slow sipping, the SEO has
unilaterally decided that landowners are only entitled to a
"Total Amount of Recoverable Groundwater"
("TAW") and that their vested water rights expire
after 100 years of pumping at the allowed annual rate. Under
this regulatory scheme, any remaining water underlying their
lands after 100 years of pumping would be left stranded and
unused. This result would serve neither of the
legislature's goals because it would both shut down
economic development and put additional strain on the
state's water resources.

¶89
I am of the opinion that the plain language of the
statute entitles the landowner to "that quantity of
water . . . underlying the land owned by the applicant."
§ 37-90-137(4)(b)(II). The SEO's TAW merely
estimates this quantity. Thus, inferring that this language
unambiguously limits the amount of water a landowner may
withdraw to anything other than the actual, physical amount
of water underlying the land is contrary to the plain
language of the statute; it interferes with landowners'
vested rights; and ultimately it will leave valuable water
unused. Hence, I respectfully dissent.

I.
Imposition of a TAW Is Not Supported by the Plain Language of
the Relevant Statutes or Regulations

A.
The Statutes Do Not Include Authority for a TAW

¶90
In construing statutes, we aim to effectuate the
legislature's intent by giving words their ordinary,
common meaning at the time of enactment.

People ex rel. Rein v. Meagher, 2020 CO 56, ¶
22, 465 P.3d 554, 559. We look to the entire statutory scheme
to give "consistent, harmonious, and sensible effect to
all of its parts," and we "avoid constructions that
would render any words or phrases superfluous or that would
lead to illogical or absurd results." Id., 465
P.3d at 559-60 (first quoting UMB Bank, N.A. v. Landmark
Towers Ass'n, 2017 CO 107, ¶22, 408 P.3d 836,
840; and then quoting Dep't of Revenue v. Agilent
Techs., Inc., 2019 CO 41, ¶ 16, 441 P.3d 1012,
1016). Because "we respect the legislature's choice
of language . . . we do not add words to or subtract words
from a statute." Id., 465 P.3d at 560. And if
the statutory language is not susceptible to multiple
interpretations, i.e., it is "clear and
unambiguous," we look no further than the language.
Larimer Cnty. Bd. of Equalization v. 1303 Frontage
Holdings LLC, 2023 CO 28, ¶ 29, 531 P.3d 1012,
1020.

¶91
The pertinent statutory language is found in the Colorado
Groundwater Management Act ("CGMA"), section
37-90-137, which sets forth the parameters for wells across
the state, other than those in designated basins, that
withdraw nontributary groundwater. In my view, the plain
language of the CGMA, along with a related portion of section
37-92-305, C.R.S. (2024), which provides water courts with
retained jurisdiction over determinations of rights for wells
made pursuant to 37-90-137(4), make clear that the
legislature did not intend to impose a volumetric cap.

¶92
The first relevant portion of the CGMA is section
37-90-137(4)(b), which contains two subsections. Subsection
(4)(b)(I) states that "[p]ermits issued . . . shall
allow withdrawals on the basis of an aquifer life of one
hundred years." § 37-90-137(4)(b)(I). Subsection
(4)(b)(II) provides that "the amount of such groundwater
available for withdrawal shall be that quantity of water,
exclusive of artificial recharge, underlying the land owned
by the applicant." § 37-90-137(4)(b)(II).

¶93
As the water court acknowledged in its order, and the parties
agree, the first subsection, subsection (4)(b)(I), sets
"the rate at which the available quantity of
nontributary groundwater may be withdrawn-not the
amount." Parker Water &Sanitation Dist.
v. Rein, No. 21CW3046, at 14 (Dist. Ct., Water Div. 1,
Mar. 2, 2023). The statute plainly directs the SEO to issue
permits to withdraw water at rates set "on the basis
of" a 100-year aquifer life. § 37-90-137(4)(b)(I).
Importantly, subsection (4)(b)(I) does not say that
the SEO must allow withdrawals for 100 years.
Indeed, subsection (4)(b)(I) sets no time or volume
limitation-it only sets the rate at which the water may be
withdrawn. It is the next subsection, subsection (4)(b)(II),
that, by its plain language, sets the amount that
may be withdrawn: "[T]he amount of such groundwater
available for withdrawal shall be that quantity of water,
exclusive of artificial recharge, underlying the land owned
by the applicant." § 37-90-137(4)(b)(II). Again,
importantly, the only limit subsection

(4)(b)(II) places on the amount a landowner may withdraw is
the actual, physical quantity of underlying water. But
despite the plain language, the majority decides that the
statute unambiguously requires the SEO to set a TAW.

¶94
In reaching that conclusion, the majority relies on its
construction of subsection (4)(b)(II). First, the majority
references Black's Law Dictionary for the proposition
that a "quantity" must, by definition, be
"measurable." Maj. op. ¶ 49. Next, the
majority reasons that because the quantity of water
underlying an applicant's land will change over time, and
because that quantity must be measurable, the SEO must
calculate the quantity of available water at the time of
permit issuance. Maj. op. ¶ 53. The majority then
interprets the SEO's estimated quantity of water to be a
total volumetric cap, forever limiting the landowner's
rights in their underlying water. Maj. op. ¶¶ 60,
62.

¶95
However, the statute does not entitle landowners to an
estimated quantity of water, but plainly to the
"quantity" of water underlying their land. That
means the entire quantity of water under their land.
Nothing in subsection (4)(b)(II) requires the SEO to quantify
the amount of underlying water such that its determination
binds landowners in perpetuity, regardless of the actual
hydrogeology. If the General Assembly intended for permits to
expire after 100 years of use, then why not say so? Simply
omitting the majority's cap better aligns with the plain
language of subsection (4)(b), as I demonstrate below.

¶96
When issuing a permit, the SEO first estimates the
"quantity of water . . . underlying the land owned by
the applicant." § 37-90-137(4)(b)(II). Next, the
SEO divides this amount by 100. The resulting rate satisfies
subsection (4)(b)(I)'s requirement that "[p]ermits
issued . . . shall allow withdrawals on the basis of an
aquifer life of one hundred years." §
37-90-137(4)(b)(I). And when withdrawn at this rate, without
a cap, the ultimate amount available to the landowner remains
as "that quantity of water . . . underlying the
land," as mandated by subsection (4)(b)(II).
Unsurprisingly, the SEO has been calculating the allowed
annual rate of withdrawal this way for fifty years.

¶97
The second relevant aspect of the CGMA is its policy of
promoting nontributary groundwater development and its
related provisions regarding material injury. The legislative
declaration contained in section 37-90-102(2), C.R.S. (2024)
"recognizes the unique, finite nature of nontributary
groundwater resources outside of designated groundwater
basins" and declares that this groundwater "shall
be devoted to beneficial use in amounts based upon
conservation of the resource and protection of vested water
rights." It clarifies that "[e]conomic development
of this resource shall allow for the reduction of hydrostatic
pressure levels and aquifer water levels consistent with the
protection of appropriative rights in the natural stream
system." Id. The declaration states

that, "To continue the development of nontributary
groundwater resources consonant with conservation shall be
the policy of this state." Id.

¶98
To execute this policy, the statute directs the SEO to issue
permits to overlying landowners if it finds that "there
is unappropriated water available for withdrawal . . . and
that the vested water rights of others will not be
materially injured." §
37-90-137(2)(b)(I)(A) (emphases added). However, the
legislature clarifies that, "Material injury to vested
nontributary groundwater rights shall not be deemed
to result from the reduction of either hydrostatic pressure
or water level in the aquifer." § 37-90-137(4)(c)
(emphasis added). This language, along with section
37-90-102(2)'s declaration that "[e]conomic
development of this resource shall allow for the reduction of
hydrostatic pressure levels and aquifer water levels,"
shows that the legislature understood that reductions in
pressure and water levels are the inherent results of
nontributary groundwater development. As soon as development
of these "finite" aquifers begins, water and
pressure levels begin to drop. Thus, because the CGMA
promotes development of nontributary groundwater, the statute
makes clear that reductions in hydrostatic pressure or water
levels shall not be deemed to be material injury.
§ 37-90-137(4)(c). To achieve the CGMA's policy of
balancing development with "conservation of the resource
and protection of vested water rights," §
37-90-102(2), the statute's "sip slowly"
provisions, discussed above, use a

conservative rate of withdrawal, and relatedly, well spacing,
to mitigate concerns regarding pressure and water levels
being reduced too quickly.

¶99
But despite this language, the majority concludes that
"[a]bsent a total volumetric limit, a permittee who
continues to pump at the maximum permitted rate for more than
100 years would end up pulling water to its well that would
not otherwise be underlying its land" and that "the
result would be a race to the bottom of the aquifer, with
earlier permittees receiving a significant head start."
Maj. op. ¶¶ 54-55. While these concerns may be
understandable from a policy perspective, they are ultimately
concerns over reductions to later permittees' water and
hydrostatic pressure levels. Because reductions to a
permittee's underlying pressure and water levels are
explicitly not material injury, in my view, the
majority's focus on guarding them is contrary to the
plain language of the statute.

¶100
Third and finally, when the legislature fleshed out the
CGMA's nontributary groundwater scheme with Senate Bill
85-5 ("S.B. 5"), discussed further below, it also
added language to section 37-92-305, regarding retained
jurisdiction for water courts. § 37-92-305(11). Section
37-92-305 guides water courts in nontributary groundwater
right determination and administration. The language added by
S.B. 5 empowers water courts to retain jurisdiction over
determinations of pumping rights made under section
37-90-137(4) "as necessary

to provide for the adjustment of the annual amount
of withdrawal allowed to conform to actual local aquifer
characteristics." § 37-92-305(11) (emphasis added).
There is no provision for adjustment of the total
allowable withdrawal. One would think that if the legislature
intended a TAW to exist, then when it updated the CGMA and
section 37-92-305 it would have simultaneously empowered
water courts to adjust this cap based on new information, as
it did for the pumping rate. But, yet again, the plain
language of the statutes does not provide for a total
volumetric cap.

¶101
The plain language of the statues assigns nontributary
groundwater to a definite use: "beneficial use in
amounts based upon conservation of the resource and
protection of vested water rights." § 37-90-102(2).
But under the policy created by the majority today, unless
the legislature rewrites the statutes, any water remaining
after 100 years of pumping, perhaps a substantial amount,
will never be put to beneficial use as the
legislature commanded.

B.
The Regulations Do Not Include Authority for a TAW

¶102
The relevant regulations, promulgated by the SEO in 1986,
also do not support the imposition of a TAW. Rule 8 of the
Statewide Nontributary Ground Water Rules provides the
procedures by which the SEO calculates applicants' annual
pumping rates. Div. of Water Res., 2 Colo. Code Regs. 402-7:8
(2024). Accordingly, the rule is titled "Determination
of Allowed Annual Amount of

Withdrawal." Id. Rule 8 contains two subparts:
Rules 8(A) and 8(B). While the details of the rule are highly
technical, the broad strokes are most relevant to the issues
here.

¶103
Rule 8(A) reemphasizes that pursuant to section 37-90-137(4),
the SEO must set annual pumping rates based on an aquifer
life of 100 years. Div. of Water Res., 2 Colo. Code Regs.
402-7:8(A) (2024). Next, Rule 8(B) guides the SEO in
calculating the "allowed average annual amount of
withdrawal." Div. of Water Res., 2 Colo. Code Regs.
402-7:8(B) (2024). Under Rule 8(B), the SEO first estimates
the total amount of recoverable water underlying an
applicant's land. To do so, it multiplies three
variables: (1) the acres of overlying land, (2) the saturated
depth, and (3) the specific yield of the underlying aquifer.
Id. To finish its calculation, the SEO divides the
product of these variables by 100. Id. The resulting
"average annual amount" is a rate of withdrawal
that allows permittees to pump one onehundredth of their
estimated underlying water per year. Id. This is the
mechanism that achieves the legislature's goal of
guaranteeing permittees at least a 100-year water supply.

¶104
The majority opinion leans heavily on Rule 8 for its
conclusion that the SEO may impose a TAW. Specifically, the
majority relies on Rule 8(B)'s directive that: "The
allowed average annual amount of withdrawal shall be 1% of
the total recoverable water." Id.
(emphasis added); see also Maj. op. ¶ 70. Rule
8(A) includes

similar language, stating that the annual rate of withdrawal
"shall not exceed one percent of the total amount of
water . . . recoverable." Div. of Water Res., 2 Colo.
Code Regs. 402-7:8(A) (2024). The majority concludes that
this language unambiguously sets forth the SEO's
authority to both find a TAW and impose it as a limiting cap
on the amount of water a well permittee may use. Maj. op.
¶ 70.

¶105
I concede that Rule 8 directs the SEO to estimate the amount
of recoverable water underlying a landowner's property.
Indeed, in my view, this is the closest any language in
either the statute or rules comes to supporting the
majority's interpretation. However, the rule does not
mention either finding the total amount a well may withdraw
over its lifetime, or imposing a cap. Further, unlike the
allowed annual amount of withdrawal, the total
amount of water recoverable has no commanding verb before it.
If the SEO included "allowed" when discussing the
annual amount to be withdrawn, why would it not have used
similar language when discussing the total amount of water
recoverable? It appears to me that it is because the total
amount of water recoverable is not the end goal of these
calculations. Instead, as reinforced below, the total amount
of recoverable water is simply a number used in calculating
the allowed annual rate of withdrawal, which is the
operative limitation authorized by statute.

¶106
Indeed, once Rule 8 is read in context, this purpose becomes
clear. The rules incorporate by reference the Statement of
Basis and Purpose for the Adoption of

Statewide Nontributary Ground Water Rules (the
"Statement"), which was contemporaneously submitted
to the Colorado Secretary of State. Div. of Water Res., 2
Colo. Code Regs. 402-7:18 (2024). The Statement explains
that, "Rule 8.B. specifies the formula to be used to
calculate the allowed average annual amount
of withdrawal. Its purpose is to standardize that
calculation." Div. of Water Res., Statement of
Basis and Purpose for the Adoption of Statewide Nontributary
Groundwater Rules, at 7 (1986) (emphases added). Thus,
the plain language of the rules declares that the purpose of
Rule 8(B) is to standardize the calculation for
finding the allowed average annual amount of
withdrawal. The Statement does not say that the amount of
recoverable water the SEO must estimate under Rule 8(B) is
meant to be binding in perpetuity, but instead, indicates
that this amount is merely a tool the SEO uses when
calculating the real goal - the allowed annual withdrawal.
Nor does the Statement say that the purpose of Rule 8(B) is
to determine the total amount a well may withdraw over 100
years. Indeed, nowhere in the regulations does such a purpose
appear.[1]

C.
Review of the Plain Language

¶107
In sum, landowners who have obtained either a decree from a
water court or a well permit from the SEO enjoy a vested
right in the actual quantity of water underlying their land.
The statute directs the SEO to set annual pumping rates such
that landowners are guaranteed a minimum useful aquifer life
of 100 years. This is how the SEO has administered
undesignated nontributary groundwater for fifty years.
Nowhere in the statutes or rules is there mention of a total
volumetric pumping limit or related 100-year permit lifetime.
The SEO cannot now create a limitation on vested property
rights where the legislature did not command it. Accordingly,
I am of the opinion that the statutes and rules are plain in
their meaning, only contemplate an allowed annual withdrawal,
and do not support the SEO's imposition of a "total
amount of recoverable water."

¶108
In many cases, the simplest explanation is the correct one. I
believe that is the case here: The plain language only refers
to an allowed annual rate of withdrawal because that was what
the legislature intended to regulate. However, it appears
that reasonable minds could differ in their interpretation of
the statutes and rules, and in fact, have. Thus, because the
relevant language is susceptible to more than one meaning, I
assume that the statute is ambiguous. Accordingly, it is
appropriate to look to other aids of statutory construction,
such as the legislative

history. And in my opinion, the relevant history supports my
statutory interpretation.

II.
The Legislative History Supports the Conclusion that the
General Assembly Never Intended a 100-year Volumetric
Limitation

¶109
When statutory language is ambiguous, "we may consider
other aids to statutory construction, such as the
consequences of a given construction, the end to be achieved
by the statute, and legislative history." 1303
Frontage Holdings LLC, ¶ 29, 531 P.3d at 1020
(quoting Bostelman v. People, 162 P.3d 686, 690
(Colo. 2007)); see also § 2-4-203, C.R.S.
(2024). This court has frequently looked to the statutory
history of the water law statutes to find intent in what is
admittedly a complex scheme. I begin by reviewing the history
of Senate Bill 73-213, which adopted the first statutory
system for allocating and administering nontributary
groundwater. Following that, I review the history of Senate
Bill 85-5, which clarified the law around permits for wells
outside of designated basins.

A.
The History of Senate Bill 73-213 Includes No Discussion of a
Cap

¶110
In 1973, the General Assembly passed Senate Bill 213
("S.B. 213"), establishing that the right to
withdraw nontributary groundwater would be subject to
overlying land ownership. Ch. 441, sec. 1, § 148-18-36,
1973 Colo. Sess. Laws 1520, 1520 (now codified at §
37-90-137(4)). The legislative history surrounding the bill
is lengthy and unveils what the legislature hoped to achieve.

¶111
At the first hearing introducing the bill, Don Hamburg, SEO
attorney and proponent of the bill, explained its purpose.
Hearing on S.B. 213 before the S. Comm. on Agric., Livestock,
&Nat. Res., 49th Gen. Assemb., 1st Sess. (Mar. 5, 1973).
He explained that the SEO had been "inundated with
requests for permits to construct wells" and that the
SEO needed direction because it had no guidelines on how to
grant the permits. Id. Mr. Hamburg also noted that
there was "a lot of water in the Denver Basin and a lot
can be used," and that lacking guidance from the
legislature, the SEO had proposed language in S.B. 213 that
would set the aquifer life to 100 years. Id. He
clarified: "There is nothing sacred about that. If the
legislature determines it should be twenty-five years,
that's fine, or if it should be fifty, that's fine.
If it should be 200-we don't know but all we're
thinking is some type of guideline as to how to grant
these." Id. Mr. Hamburg concluded, "[I]t
boils down to a lifetime, of how long you want it to
last." Id.

¶112
In response, Senator Harry M. Locke asked Mr. Hamburg
"How are you going to determine whose water you might be
taking?" Id. Mr. Hamburg started by noting that
the aquifers at issue are well-defined, and that after being
penetrated, pumping creates a cone or cylinder of depression
from which water is drawn down over time. Id. Next,
he explained that by setting a time period, such as 100
years, and a withdrawal rate tied to that time period, wells
can be spaced such that the cones of depression will not
intersect for the set time period. Id.

¶113
Jack Ross, an attorney representing water districts,
summarized that nontributary groundwater is a finite
resource, and that "[t]he question to the legislature
is: 'How long do you want to make that resource work for
us? Do you want to let it be worked out in twenty years or
thirty years or 100 years or 200 years? You can make that as
a legislative determination, regardless of the
facts.'" Id. He agreed with Mr. Hamburg
that, with that determination, the SEO could then "go
back to the drawing board with our engineering evaluations
and figure out what kind of well spacing is needed . . . to
parcel it out within that framework." Id.

¶114
From this first legislative session, it is clear that 100
years was neither "sacred" nor even tied to fact.
Instead, the legislature's goal was to provide a
declaration that the SEO could use as a basis for its
issuance of well permits. Those permits would feature annual
withdrawal rates that ensured a 100-year aquifer life while
also facilitating well spacing that would avoid injury to
others with vested rights.

¶115
A few days later, Harlan Erker, SEO engineer and chief of
ground water operations, testified that "the gallons per
minute is not critical, the number of acrefeet per year is
...." Hearing on S.B. 213 before the S. Comm. on Agric.,
Livestock, & Nat. Res., 49th Gen. Assemb., 1st Sess.
(Mar. 7, 1973). Senator Wunsch soon interjected:
"There's nothing about volumetric rights in your
bill." Id. Mr. Erker

responded: "Right, but that comes in, in the life of the
aquifer again. In other words, they can pump-in 100 years, in
their cylinders, they get to pump one onehundredth of that
cylinder in any year." Id. (emphasis
added). Similarly, at a later meeting, Jack Ross
testified that "when someone comes to ask for a well
permit, you analyze the depth or the thickness of the
saturated sands, you determine the maximum pumping rate that
you think is realistic." Hearing on S.B. 213 before the
H. Comm. on Nat. Res., 49th Gen. Assemb., 1st Sess. (June 6,
1973). He continued, "That is all the state engineer
would do." Id. This testimony shows that the
drafters understood that "all the state engineer would
do" is "determine the maximum pumping rate."
Id. There is no mention of the SEO determining a
total volumetric limit.

¶116
At another hearing, the SEO again recognized that the
100-year aquifer life was a policy choice. Mr. Erker stated,
"We don't know if 100 years is right. It's not
an engineering decision. We're asking you for this
particular figure. If you tell us that seventy-five years is
right, we'll believe you. If you tell us that 150 years
is right, we'll believe you." Hearing on S.B. 213
before the S. Comm. on Agric., Livestock, &Nat. Res.,
49th Gen. Assemb., 1st Sess. (Mar. 14, 1973). He continued,
"We don't really know what the life of that aquifer
is .... The life of the aquifer depends on how many wells you
put into it." Id. When a stakeholder wondered
where the 100-year figure originated, State Engineer Clarence
J. Kuiper

answered, "Well, I can tell you where the 100 years came
from, right off the top of my head. To give the committee a
figure to start with. They may want to go to twenty-five or
200 . . . it's just so we can have some kind of guideline
so when a subdivision developer goes in, that home builder
knows that he has a water supply for a given length of
time." Id.

¶117
Consultant Herb Wells responded, "[B]efore we spend that
money, I want to be darn sure that what I'm providing is
a permanent supply of water .... I want to know that when you
go into that house you'll have water for your lifetime,
your children will have water for their lifetime, and their
children will. I'm not saying 100 years .... This is a
utility point of view." Id. Senator Kenneth
Kinnie supported that statement by saying, "What I think
is important is that we have got to make up our minds how
long the legislature is going to obligate the state in the
life of the well, for the people that buy the homes, how long
that we say that they're going to have water."
Id. Soon after, Mr. Ross responded, "It is a
function of economics as well as a political judgment of
sociology, because if you say it is going to be 200 years and
that makes the well radius three miles, then no one will
develop the resource." Id.

¶118
This session shows that the legislators understood that the
100-year aquifer life was a compromise that balanced prudent
resource use with development. Those at the hearing
recognized that it was a matter of economics. Expanding the

aquifer life would in turn expand the size of the cone of
depression, which would increase the spacing that would be
required between wells. Further spaced wells would require
more labor and materials and would therefore be more costly.
This economic consideration played a part in the
drafters' decision to assign the aquifer a 100-year life,
as opposed to a 200-year life. If the costs were
"exorbitant," "no one w[ould] develop the
resource." Id. And the drafters wanted the
resource to be developed. Nowhere in this history does anyone
consider that well users would have to stop pumping after 100
years if there was still water left to pump. Quite the
opposite; the legislators were keenly aware of both the high
cost of setting wells and that their constituents sought
permanent water supplies.

¶119
About a month later, the committee unanimously amended the
proposed legislation to include the word "minimum,"
setting forth that the useful life of the aquifer was to be a
minimum of 100 years. Hearing on S.B. 213 before the
S. Comm. on Agric., Livestock, &Nat. Res., 49th Gen.
Assemb., 1st Sess. (Apr. 9, 1973). Mr. Erker explained that
"[w]hat we're saying is the minimum useful life of
the aquifer is declared to be 100 years, assuming there is no
outside water brought in." Id. Similarly, a few
weeks later Mr. Ross testified, stating on behalf of his
clients, "I want to be able to tell them, once they
acquire a right to drill a well and develop this resource,
that they are going to have 100-year practical life, or
perhaps even longer, because things don't always work out
the way the engineers expect it to."

Hearing on S.B. 213 before the S. Comm. on Agric., Livestock,
&Nat. Res., 49th Gen. Assemb., 1st Sess. (May 7, 1973).

¶120
Including the word "minimum" signals the
drafters' acknowledgement that some wells might be able
to pump for longer than 100 years. The legislators and the
SEO needed to set a rate of withdrawal and decided to protect
the expectation that the aquifer would be available to pump
for at least 100 years. Similarly, Mr. Ross's
testimony shows that those in attendance understood that S.B.
213 would give well owners a "100-year practical life,
or perhaps even longer." Id. There is no
mention of a cap, or that permits would expire and pumps
would be turned off after 100 years. If that were the case,
the legislators could easily have assigned each
permit a life of 100 years. And one would expect
some discussion of a hard cap during the legislative process.

¶121
In my opinion, this legislative history shows that S.B. 213
was intended to set the minimum useful life of the aquifer so
the SEO could have a measure by which to issue permits.
Throughout the history, no one mentions limits on the amount
of water landowners may use other than their annual allotment
and the physical quantity of underlying water. No one
expressed nor implied that pumping would cease after 100
years where underlying water remained. The legislators
clearly intended that landowners would be able to use their
underlying water to exhaustion after at least 100
years of pumping.

B.
The History of Senate Bill 85-5 Includes No Discussion of a
Cap

¶122
In 1985, the General Assembly considered S.B. 5, which
ultimately fleshed out the statutory scheme governing
nontributary groundwater. S.B. 5 codified a definition for
nontributary groundwater, made a legislative declaration as
to its intended uses, further defined the system for
allocating and administering nontributary groundwater outside
of designated basins, and granted the State Engineer
substantive rulemaking authority over the resource. Most
relevant here, S.B. 213's language in the CGMA stating
that "the minimum useful life of the aquifer is one
hundred years" was changed to instead say
"[p]ermits issued pursuant to this subsection (4) shall
allow withdrawals on the basis of an aquifer life of one
hundred years." Ch. 285, sec. 3, § 37-90-137(4)(b),
1985 Colo. Sess. Laws 1160, 1163; see also §
37-90-137(4)(b)(I). However, the legislative history shows
that despite this change in language, the "minimum
life" thrust of S.B. 213 remained intact.

¶123
In the words of Charlie Elliott, who worked with the
committee responsible for the bill, S.B. 5 "[kept] the
main principles of Senate Bill 213." Hearing on S.B. 5
before the S. Comm. on Agric., Nat. Res., &Energy, 55th
Gen. Assemb., 1st Sess. (Jan. 24, 1985). He acknowledged,
"The mining of this water . . . we're not going to
allow it to go in a quick amount of time, but in 100 years,
it could conceivably be depleted." Id.
He continued, "[I]t will probably last much longer than
that .... It

may last 100 years, it may last 150, or even 200 years, under
this legislative proposal, which is the same proposal put
into effect in '73. We're buying time."
Id. He clarified, we "[d]on't want to shut
it down, because that would have pretty drastic economic and
social consequences in the state, and that's why the
state decided that was not the policy that we're going to
follow, back in '73 ...." Id. Mr.
Elliot's testimony recognizes that neither S.B. 213 nor
S.B. 5 intended to shut down the development of nontributary
groundwater in the state.

¶124
In addition to maintaining the policy goals of S.B. 213, S.B.
5 defined material injury. At the first meeting on the bill,
Senator Fred Anderson recognized that hydrostatic head
pressure is affected by each new well, and that "you
cannot depend on this pressure. Because if you do, then
you'll never develop the resource." Hearing on S.B.
5 before the S. Comm. on Agric., Nat. Res., &Energy, 55th
Gen. Assemb., 1st Sess. (Jan. 24, 1985). He stated
that in S.B. 5, "We make a very definite statement that
it's not considered injury to the fact that you lose head
pressure." Id. At a later meeting, David
Harrison of the Colorado Water Congress, expanded on this
idea, noting, "If your water table is going down, your
remedy is to get a bigger pump yourself." Hearing on
S.B. 5 before the H. Comm. on Agric., Livestock, &Nat.
Res., 55th Gen. Assemb., 1st Sess. (May 8, 1985). He also
explained that it was "not possible to protect pumping
levels of other wells, except to make sure that they
don't get sort of an unfairly exaggerated impact. And
that's

what the spacing requirement is about." Id.
Finally, he stated: "Everybody gets the same 100-year
based allowance. The water table is going down; help
yourself. It's that kind of situation." Id.
(emphasis added).

¶125
This testimony shows that the legislature never intended to
protect hydrostatic head pressure or water levels in the
aquifer, because doing so would severely stunt development of
the resource. Instead, the history shows that the drafters
chose to ensure fairness through proper well spacing, and
relatedly, by regulating annual pumping rates. Mr.
Harrison's statement that "[e]verybody gets the same
100-year based allowance" neither expresses nor
implies that pumping beyond 100 years would be forbidden. The
only end-of-life limitation implied or expressed by this
history is the actual, physical limitation of the underlying
water being exhausted.

¶126
At a subsequent meeting, David Getches, Executive Director of
the Department of Natural Resources, reinforced this
understanding when he testified, "The enactment of the
proposal is effectively a legislative announcement that
nontributary groundwater is available for total
depletion in the next few generations." Hearing on
S.B. 5 before the S. Comm. on Agric., Nat. Res., &Energy,
55th Gen. Assemb., 1st Sess. (Mar. 7, 1985) (emphasis added).
Later, Jim Gehn, a consultant with the Colorado Ground Water
Association, explained the practical reality of mining the
Denver Basin aquifers: "Certainly it's an economic

issue, also. In the year 2030, or '40 down the road,
it's going to be very expensive to pump this nontributary
water from the deeper aquifers." Id. At a
subsequent hearing Mr. Gehn continued: "If we look at .
. . the maximum build-out of the Denver Basin over the next
seventy years, and extend that on to 100 years . . . we would
deplete those four aquifers in Denver Basin 4% their total
depletable amount." Hearing on S.B. 5 before the H.
Agric. Comm., 55th Gen. Assemb., 1st Sess. (Mar. 26, 1985).
He then summarized, "So to say that the 100-year life is
going to totally be exhausted in 100 years, or to understand
it that way, is erroneous." Id. Similarly, Mr.
Elliott emphasized that, "Senate Bill 5 continues the
conservation standard of the 100-year, minimum
aquifer life. It doesn't say maximum, it says
minimum .... [W]e're looking at very long
periods of time before this water is depleted."
Id.

¶127
This testimony exhibits that while the drafters expected
landowners to use their underlying water to total depletion
eventually, they also expected the economics of drawing from
deeper aquifers to provide an inherent check on pumping, in
addition to the annual allotment determined by the SEO.
Further, the above testimony shows that lawmakers understood
that because of the vast quantity of water available, basing
annual pumping rates on a minimum 100-year aquifer lifetime
would not realistically result in critical depletion of the
broader Denver Basin aquifers anytime soon.

¶128
Later, Senator Anderson spoke in favor of the bill: "I
want to protect agricultural water. And I'll tell you
this, the decision was made twelve years ago [with S.B. 213]
that this is indeed a finite resource. And we're going to
use it on a conservative basis, but we're going to use
it." Id. He continued by explaining that
"[d]evelopment is going to continue in Colorado. And if
we don't develop this resource" the necessary water
is "going to come from agricultural uses."
Id.

¶129
Senator Anderson's comments exemplify the
legislature's intent that nontributary water would be
used. Curtailing its development would force
would-be users to obtain water from others who held water
rights, which in many instances are agricultural-use rights.
It is common knowledge that surface waters are already
over-appropriated across the state. Thus, the legislature
understood that leaving accessible nontributary water in the
ground would inherently put additional strain on the
state's other water resources.

C.
Review of the Legislative History

¶130
In summary, the legislative history, like the statute's
plain language, never discusses imposing a lifetime
volumetric cap on nontributary wells. Many people
representing a wide variety of interests testified at the
legislative hearings on both bills, and never mentioned that
a well permit would expire after 100 years of

pumping at the maximum permitted rate.[2] If the
legislature ever considered such a limit, there would have
been lengthy and heated debate over the issue. To put it
modestly, this would have been a weighty and controversial
policy change, even in 1973 and 1985, when there was less
pressure on the state's water resources than exists
today. In my view, it makes no sense to conclude that where
the statute is silent as to a cap, and the legislative
history never mentions a cap, that the legislature
unambiguously intended for a cap to exist.

III.
The Majority's Construction Results in Consequences the
General Assembly Never Intended

¶131
"If a statute is ambiguous, the court, in determining
the intention of the general assembly, may consider. . .
[t]he consequences of a particular construction." §
2-4-203(e). "[T]he best guide to intent is the
declaration of policy which forms the initial part of an
enactment." Walgreen Co. v. Charnes, 819 P.2d
1039, 1044 (Colo. 1991). Where a particular construction of a
statute would lead to a result contrary to the stated
legislative intent, we have held that the legislature did not
intend that construction. See, e.g.,
id. at 1044-45 (concluding that where

the statutory language was ambiguous, the city at issue was
not exempt from the statute because exemption would have
frustrated the legislature's stated intent).

¶132
Here, the CGMA declares that "nontributary groundwater
shall be devoted to beneficial use in amounts based
upon conservation of the resource and protection of vested
water rights," and that to "continue the
development of nontributary groundwater resources . . . shall
be the policy of this state." § 37-90-102(2)
(emphases added). Thus, with the CGMA, the General Assembly
sought to balance its twin aims of economic development and
conservative use of the groundwater resource. The legislature
achieved this balance by regulating withdrawals to ensure a
minimum aquifer life of 100 years. It is my position that the
majority's interpretation of section 37-90-137(4), which
cuts off nontributary water rights after 100 years of pumping
at the allowed rate, frustrates this clearly stated
legislative purpose.[3]

¶133
If the majority's construction were to be implemented,
the most obvious question is, "What happens next?"
Understandably, the majority does not enter this terrain. But
this question helps illuminate the issue before us. As I see
it, there are two primary possibilities regarding what might
occur after a permit expires.

¶134
The first is a true termination of the landowners' vested
water rights, which appears to be the result the SEO
advocates for. This option would cut off the landowners'
water rights after the total volumetric cap is reached:
"[O]nce a well's total volumetric limit is reached,
the permittee must stop operating the well." Maj. op.
¶ 48. And because, as noted above, an unknown quantity
of underlying water will likely remain after a landowner
withdraws the SEO's estimated quantity, this rule would
leave that remaining water stranded underground. There it
would wait, until unspecified neighbors have pumped their own
underlying water for 100 years. After that, the remaining
water underlying each of the properties would sit stranded
and unused.

¶135
The second possibility is that landowners could apply for new
permits to pump any remaining underlying water. Even though
this option would allow the possibility of continued pumping,
it would nonetheless inject a great degree of uncertainty
into landowners' long-term water supplies.

¶136
Neither the statutes, the rules, nor the legislative history
say anything about these possible consequences. In fact, none
of these sources say anything regarding how expired permits
should be treated. There is no direct evidence that anyone,
including the General Assembly or the SEO, much less water
users, ever understood or intended that the possibilities
outlined above would occur. That silence speaks volumes about
what the legislature intended. If the General

Assembly meant to cap pumping after 100 years, it would have
instructed both the SEO and water users that this was the
case.

¶137
And at the same time, the majority's construction would
have severe and unexpected consequences for water users, like
Parker, who require a stable water supply. Upon learning that
their nontributary water rights will be terminated or called
into question in as little as fifty years, these landowners
would immediately need to reorient their long-term water
supplies. Doing so would necessarily put greater pressure on
the state's other surface and groundwater resources. It
would also put significant and unexpected strain on these
users' planning departments and budgets. And all the
while, nontributary water would remain underlying their land,
stranded and unused. A construction of the statute that leads
to these consequences is contrary to the legislature's
stated intention that "nontributary groundwater shall be
devoted to beneficial use" and that "[t]o continue
the development of nontributary groundwater resources . . .
shall be the policy of this state." § 37-90-102(2).

IV.
Conclusion

¶138
Nothing in the plain language of the statutes or rules
provides for, much less requires, a total volumetric limit or
related permit lifetime. Nonetheless, by declaring that the
statute unambiguously requires a limit, the majority avoids
consideration of both the legislative history and the
consequences of its ruling.

¶139 But the legislative history, like the text of the
statute, is void of any mention of a volumetric cap. Thus, to
accept the majority's interpretation requires concluding
that in 1973, and again in 1985, the legislature voted to
curtail water rights in Colorado without anybody
raising their hand to ask a question or object.

¶140
Further, the General Assembly explicitly declared that
nontributary groundwater in Colorado is to be devoted to
beneficial use and developed consonant with
both conservation and the protection of vested
water rights. But capping wells, as the majority's
interpretation does, will leave water unused, putting
additional pressure on the state's water resources,
straining users' budgets, and abrogating landowners'
vested rights. These consequences contravene the
legislature's declared policy of balancing conservative
water use with economic development.

¶141
For the above reasons, I disagree with the majority's
construction of section 37-90-137(4) deciding that the SEO
has the authority to impose a TAW on nontributary wells
statewide. If in the future the legislature changes its mind
and wants these wells to cease pumping after 100 years, then
it will use its plenary power over the state's
nontributary water resources to direct the SEO accordingly.
Thus, I respectfully dissent.

---------

[1] We have direct appellate review
jurisdiction over water adjudications pursuant to Colo.
Const. art. VI, § 2(2), section 13-4-102(1)(d), C.R.S.
(2024), and C.A.R. 1(a)(2). Parker raises the following six
issues on appeal:

1. Whether the Water Court erred in determining as a
matter of law that the plain language of C.R.S. §
37-90-137 unambiguously sets forth, requires and/or allows
the State Engineer and the Division of Water Resources
(collectively, the "SEO") to impose a total
volumetric limit on the amount of nontributary groundwater
that may be withdrawn pursuant to well permits issued
pursuant to C.R.S. § 37-90-137(4).

2. Whether the Water Court erred in determining as a
matter of law that the Statewide Nontributary Groundwater
Rules, 2 CCR 402-7 ("Rules") unambiguously set
forth, impose and/or require a total volumetric limit on the
amount of nontributary groundwater that may be withdrawn
pursuant to well permits issued pursuant to C.R.S. §
37-90-137(4).

3. Whether the Water Court erred in determining as a
matter of law that the SEO has authority under C.R.S. §
37-90-137 to impose on well permits a total volumetric limit
on the amount of nontributary groundwater that may be
withdrawn where such limit is absent from and/or inconsistent
with the terms of the underlying water court decrees.

4. Whether the Water Court erred in determining as a
matter of law that a total volumetric limit should be read
into every water court decree and well permit where such
decrees and permits only provide for an allowed average
annual withdrawal (or its functional equivalent).

5. Whether the Water Court erred in determining as a
matter of law that the plain language of Senate Bill 213 (the
prior version of C.R.S. § 37-90-137, in effect from 1973
to 1985) unambiguously sets forth, requires and/or allows the
SEO to impose a total volumetric limit on the amount of
nontributary groundwater that may be withdrawn pursuant to
well permits issued under Senate Bill 213.

6. Whether the Water Court erred by staying all
discovery and precluding the presentation of evidence,
thereby making the determinations in the 2022 Order and 2023
Order without affording the ability to conduct discovery or
present evidence that would help establish and/or resolve any
ambiguity in the statute or Rules.

[2] An acre-foot is the amount of water
needed to cover one acre of land with one foot of water. It
is equivalent to 43,560 cubic feet or 325,851 gallons of
water.

[3] The United States Geological
Survey's most recent data estimated that, by 2003, dry
climactic conditions and continued well pumping in the Denver
Basin had resulted in an annual depletion of approximately
41,266 acre-feet of Denver Basin aquifer water per year. U.S.
Geological Surv., supra, at xi. Estimated annual
storage depletion increased exponentially beginning in 1999
and was expected to continue increasing with population
growth in the Denver metropolitan area. Id. at
xi-xii.

[4] This appeal concerns only nontributary
groundwater in the Dawson, Denver, Arapahoe, and Laramie-Fox
Hills aquifers that make up the Denver Basin.

[5] Under the Groundwater Management Act,
the legislature also classified some Denver Basin groundwater
as "designated." § 37-90-103(6)(a). Designated
groundwater is defined as that which, "in its natural
course would not be available to and required for the
fulfillment of decreed surface rights" or that is found
"in areas not adjacent to a continuously flowing natural
stream" where groundwater has historically
"constituted the principal water usage." §
37-90-103(6)(a). Designated groundwater is managed by the
Colorado Ground Water Commission, which issues permits upon
application. § 37-90-107(1), C.R.S. (2024). Because all
of the groundwater at issue in this appeal is nondesignated,
nontributary groundwater, the term "nontributary
groundwater" throughout this opinion refers to
nondesignated, nontributary groundwater unless otherwise
indicated.

[6] Not nontributary groundwater is unique
to the Denver Basin. § 37-90-103(10.7) ("'Not
nontributary groundwater' means groundwater located
within those portions of the Dawson, Denver, Arapahoe, and
Laramie-Fox Hills aquifers that are outside the boundaries of
any designated groundwater basin. . . the withdrawal of which
will, within one hundred years, deplete the flow of a natural
stream . . . at an annual rate of greater than one-tenth of
one percent of the annual rate of withdrawal."); N.
Kiowa-Bijou, 77 P.3d at 73 n.21. This classification,
while grammatically perplexing, is intentional. It reflects
the General Assembly's recognition that because this
water is hydrologically connected to a surface stream, it is
not actually nontributary. N. Kiowa-Bijou, 77 P.3d
at 73 n.21. The legislature opted, however, to administer
this water separately from tributary water "in
recognition of the de minimis amount of water discharging
from the [Denver Basin] aquifers into surface streams . . .
when compared with the great economic importance of the
groundwater in those aquifers." §
37-90-103(10.5).

[7] Between the time the legislature
enacted Senate Bill 213 and the printing of the 1973 Colorado
Revised Statutes in 1974, section 148-18-36 was recodified as
section 37-90-137. The laws enacted and amended in 1973 were
not printed in a supplement to the 1963 Colorado Revised
Statutes but were printed for the first time in 1974 using a
new numbering system.

[8] As a quasi-municipal special district
that provides water services to landowners within its
boundaries, Parker has the right to withdraw and use Denver
Basin groundwater underlying Parker's boundaries pursuant
to section 37-90-137(8), which provides, in part:

[W]herever any existing municipal or quasi-municipal
water supplier is obligated either by law or by contract in
effect... to be the principal provider of public water
service to landowners within a certain municipal or
quasi-municipal boundary ..., said water supplier may adopt
an ordinance or resolution. . . which incorporates
groundwater from [the Denver Basin aquifers] underlying all
or any specified portion of such municipality's or
quasi-municipality's boundary into its actual municipal
service plan. . . . Upon the effective date of such ordinance
or resolution, the owners of land which overlies such
groundwater shall be deemed to have consented to the
withdrawal by that water supplier of all such groundwater
....

[9] We note that even if we were to look
at legislative history, the bill's proponents
acknowledged from the very first hearings on Senate Bill 213
that the State Engineer was being inundated with permit
applications to mine the Denver Basin aquifers from housing
developments along the southern front range, and that the
mining of nontributary groundwater would be a finite
operation that would only serve the developments that relied
on it for a relatively short period of time. "All of the
residential development in the Parker-Franktown-Castle Rock
area taps into these supplies," said Harlan Erker, the
chief engineer in charge of groundwater operations in the
Division of Water Resources at a meeting of the Senate
Committee on Agriculture Livestock and Natural Resources on
March 7, 1973. "Another area where people are really,
where it's really hot is in the Parker area. They're
requesting permits out there in the Denver Basin for new
subdivisions," said Don Hamburg, an attorney for the
State Engineer at a March 5, 1973 meeting of that same
committee. "The way the applications are coming in in
the Monument, Colorado Springs area, the way the applications
have come in they can drain that aquifer in a relatively
short period of time if we were to grant them all," said
Hamburg. The statutory scheme enacted by the legislature was
a way of ensuring that every landowner got their fair share
-but no more -and stretched the life of the aquifers out to
at least 100 years. But the rapid depletion of the Denver
Basin aquifers, the impact of that depletion on these
developments, and the need to avoid a race to the bottom of
the aquifers were all looming problems that were widely
discussed by those involved in crafting this
legislation.

[1] In the interest of brevity, I omit a
thorough review of the technical aspects of the rules.
However, nothing in the plain language of the rules, beyond
the discussed portions of Rule 8, seems to support the
majority's construction. Indeed, the majority cites no
other portions of the rules in support of its
position.

[2] Although my discussion of the
legislative history has admittedly been lengthy, I have
omitted many citations in the interest of brevity. A thorough
review of the legislative history, including the portion
cited by the majority in its Footnote 9, reveals no mention
of a total volumetric cap, permit lifetime, or anything of
the sort.

[3] As the majority notes in its Footnote
4, this appeal only concerns the Denver Basin aquifers. I
agree. The statutes and rules at issue, however, apply
statewide.

---------